[No. 20534. In Bank.— March 1, 1890.]

In the Matter of the Disbarment of M. A. LUCE, J. W. McDONALD, and E. S. TORRANCE.

Attorneys — Proceedings for Disbarment — Dismissal as to Innocent Partner. — A proceeding to disbar several attorneys comprising a firm, for alleged dishonorable and unprofessional conduct, will be dismissed as to one of the partners who is shown to have had no personal knowledge or connection with the wrongs complained of.

Id. — Reputation of Accused Attorneys. — In such a proceeding, which is *quasi* criminal in its nature, the respondents are entitled to the benefit not only of the presumption, but of such proof as is made, of good character and reputation in the consideration of testimony tending to create or leave a doubt as to the fact or intent of their acts.

Id. — Assignment by Insolvent — Payment to Attorney as Creditor. — An insolvent debtor has the right to pay off any creditor, if he desires to do so, though he may intend at the time to make an assignment for the benefit of creditors; and an attorney, who is a creditor of such insolvent, accepting payment either in money or in chattels, even with a knowledge of such intent, if he did it *bona fide*, receiving only his just due, and if paid in chattels at their fair value, and without intent to return them to the debtor, is not guilty of fraud in the transaction, and his conduct furnishes no ground of disbarment.

Id.— Payment and Acceptance of Attorney's Fee for Assignment. — The payment by an insolvent debtor and the acceptance by his attorneys of their fee in advance, out of the goods of the insolvent, if the salable value of the goods does not exceed a reasonable fee for the service which might be reasonably anticipated, and the goods are not to be returned, does not render the parties liable to the charge of a fraudulent conspiracy, or the attorneys who accepted such goods liable to disbarment for accepting them.

Id. — Proper Action of Attorneys for Insolvent — Representing Assignee — Advice to Insolvent. — Attorneys for an insolvent debtor do not improperly become attorneys for the assignee in the conduct of his business as such by defending an action by a creditor against the insolvent and the assignee to set aside the assignment for fraud charged against the insolvent debtor. Nor do they render themselves parties to any acts of concealment of his property, if their advice to him is conditioned upon the good faith of his transactions in the supposed payment of his *bona fide* debts, and they have no knowledge of any fraudulent acts.

Id. — Inadvertently Representing Creditor and Insolvent.— Attorneys representing a creditor who has a small demand against an insolvent debtor when they become attorneys for such insolvent respecting his assignment, if they have received no retainer from the creditor, and have acted inadvertently and upon oversight of the claim in their hands when accepting a retaining fee from the insolvent, and have explained the matter to the creditor, who does not complain, will not

be disbarred for unprofessional conduct, upon complaint of another creditor.

Id. — Cutting Leaves from Private Memorandum-book of Insolvent. — The cutting out of leaves from a private memorandum-book of an insolvent debtor, which is no part of his assets, and which was not required to be placed in the hands of the assignee, if done by the attorneys of the insolvent, with the consent and knowledge of the assignee, without any fraudulent purpose, but only to be kept by the attorneys of the insolvent for the protection of their client, constitutes no unprofessional conduct or violation of the oaths or duties of the attorneys.

Application of August Heilbronner for disbarment of M. A. Luce, J. W. McDonald, and E. S. Torrance, as attorneys at law, for alleged unprofessional conduct.

The facts are stated in the opinion of the court.

*Rothchild & Ach,* for Petitioner.

*Bicknell & Denis,* and *Chapman & Hendrick,* for Respondents.

Fox, J.—This is an application made and filed by August Heilbronner for the disbarment of the above-named defendants, composing the law firm of Luce, McDonald & Torrance, attorneys at San Diego. The record is very voluminous, consisting of some eight hundred pages of testimony and about three hundred pages of printed argument. A careful examination of the entire matter reveals the fact that the proceeding is one of many instituted under both the civil and the criminal law in the course of a bitter contest between Heilbronner, a creditor, and K. C. Naylor of San Diego, an insolvent debtor. Very much of the evidence introduced, and of the argument made, has no relation to this case, except as by it it is attempted to show that Naylor was guilty of divers frauds, or attempted frauds, to avoid a just settlement with his creditors, and that these defendants, his attorneys, were cognizant of and active participators in those attempted frauds.

Naylor is not on trial in this proceeding, and there

would be a manifest impropriety in our discussing the question of his guilt or innocence at this time. The very nature of the case requires that we should refer to some of his transactions, but it will be understood that in doing so it is merely for the purpose of illustrating the fact and the legal effect, as to them, of the connection of these defendants with those transactions.

And here we may as well dispose in the outset of one of the defendants. The alleged wrongs complained of, so far as it is claimed that there were any wrongs on the part of these defendants, commenced early in January, 1889. The firm of Luce, McDonald & Torrance was formed December 1, 1888. The defendant Luce was the senior partner, and the head of that firm, but he had never been the counsel of Naylor, and there is nothing in all the evidence offered in this case to connect him in any manner with the frauds, if any, attempted by Naylor; nor is there anything to connect him with the transactions of his partners which are claimed to have been fraudulent, except that they used the firm name in the conduct of the legal business growing out of the Naylor assignment. It is not shown that he even had knowledge of the character or extent of that business, or upon what terms or for what consideration it was being conducted. Under these circumstances, we dismiss at once, and without further discussion, these charges, so far as they relate to the defendant M. A. Luce.

As preliminary to a consideration of the points separately which are made against the defendants McDonald and Torrance, it may be proper to say that it appears that they are both lawyers of many years' service at the bar. McDonald had been a resident of San Diego about two years, and Torrance a little over one year, when the firm of Luce, McDonald & Torrance was formed. Both have borne a good reputation as attorneys and as men of integrity and honor since their residence in San Diego. Both came to this state from Kansas, and are

proven to have borne an enviable reputation as lawyers and men in that state for many years before they came to California, Mr. Torrance resigning the position of district judge, which he had filled with distinction for nearly two terms, in order to come here, and having once been nominated for judge of the supreme court, but subsequently declared ineligible because of the fact that he held the position of district judge at the time. These facts are stated preliminarily, because these defendants in this proceeding, which is *quasi* criminal in its nature, are entitled to the benefit not only of the presumption, but of such proof as is made, of good character and reputation in the consideration of the weight to be given to their own testimony, as well as to such other evidence as may tend to either create or leave a doubt as to the fact or intent of their acts.

A few other facts of general application may be stated. K. C. Naylor was engaged in the jewelry business at San Diego, and as early as June, 1888, became heavily embarrassed and pressed for money to meet his obligations. In that month he took an account of stock and made an inventory, making the original entries thereof in a book such as is sometimes called a " tickler," — a sort of memoranda-book usually used for writing memoranda in pencil,— which had never been used before, and was never afterward used by him. From the entries made in this book an inventory of the stock, showing stock and fixtures on hand to the amount of $25,675.38, was made up and sent to the creditors in San Francisco, with a view to securing forbearance. This was done in June, 1888.

In January, 1889, Naylor was indebted about fifteen thousand dollars, and of this something over twelve thousand dollars was in the form of a promissory note held by the complainant, Heilbronner, and represented all the then known Eastern and San Francisco claims against him. On the 9th of January, 1889, Heilbronner ap-

peared in San Diego, and threatened immediately to attach, unless Naylor would either pay him at once eight thousand dollars or give him approved security for his entire debt, or make to him, Heilbronner, an assignment of all his property for the benefit of his creditors. Naylor could not pay the money, but he made a statement in writing to Heilbronner, to the effect that his assets were equal to twenty thousand dollars, and that he did not owe to exceed five hundred dollars exclusive of the amount due to him (Heilbronner), and upon some promise, either to find security, or make the assignment requested (the testimony being conflicting as to just what the promise was,—but that being immaterial), induced Heilbronner to give him a few days' further time, and the latter then left the city. The further facts necessary to be stated in this connection will be stated as we consider the separate points or charges made against these defendants.

1. On the tenth day of May, 1888, Torrance had loaned to Naylor $1,000 in money, and received from Naylor, as collateral security for the repayment of the same, goods from the store which Naylor represented as being worth $1,414.28, at the cost price to him. About the middle of November, the money being past due, and only a small payment having been made thereon, and that out of the proceeds of the sale of some of the goods so deposited, which had been returned to Naylor, at his request, for that purpose, Torrance took the goods to an expert, and had them examined and appraised. The amount then remaining in his hands, at the price at which they had been deposited, was $1,373.85. The expert placed their wholesale value at $650 to $700, but at the same time said that the selling value of the goods in San Diego would be considerably less than the wholesale value he had placed upon them. Shortly after ascertaining the real value of the goods, Torrance informed Naylor that he had had the goods valued by

an expert, who had placed a value on them of less than fifty cents on the dollar of Naylor's valuation, and insisted on Naylor paying the note, telling him that if he did not have the money, he must pay in goods, or in some way raise the money. Naylor replied that he had a man in view from whom he expected to get the money, and thereafter Torrance saw Naylor many times, and pressed him for the money. On the 10th of January, 1889, Torrance saw Naylor, and insisted that the matter must be settled at once; if he did not have the money, he must satisfy the claim with jewelry. Naylor then paid him one hundred dollars, and asked for further time, which Torrance refused to give. Naylor then said that he would see him the next day, and close the matter up by paying him in goods. On the morning of the 11th, Naylor called at the office of Torrance to settle the matter, when Torrance told him, as he had done before, that the goods he had were worth less than fifty cents on the dollar of the price Naylor had placed on them, that he had no use for them himself, and he would not be willing to take them for more than five hundred dollars. There was then due on the note $827. It was then agreed between them that Torrance should keep the goods he had in hand as payment on the note to the extent of five hundred dollars, and that Naylor should deliver, in addition thereto, goods at fifty cents on the dollar of Naylor's valuation, sufficient to pay the balance of the note, $327. There is a little uncertainty as to whether this occurred on the 10th or 11th of January, but we conceive that point to be immaterial. Complainant contends that this arrangement was made in contemplation of assignment by Naylor, and for the purpose of defrauding his creditors, and that Torrance knew of the contemplated assignment, and entered into the arrangement for the purpose of aiding and assisting in the contemplated fraud; that the transaction was not *bona fide*, but for the fraudulent purpose aforesaid, and with a secret under-

standing that at the proper time Naylor would be allowed to pay off the debt and have return of the goods. And he insists that we must assume, from the nature of the transaction, that both Naylor and Torrance swore falsely when they testified that, at the time of this transaction, Torrance and his firm were wholly ignorant of what had transpired between Heilbronner and Naylor on the 9th, and of the fact that Naylor contemplated any proceedings in the nature of assignment or insolvency. Whatever may have been in the mind of Naylor, we see no reason for disbelieving his testimony, or that of Torrance, on the question of knowledge on the part of Torrance of contemplation of assignment at the time of this transaction. Nor is there anything in the evidence to support the proposition that he acted with any intent to facilitate the commission of a fraud on the part of Naylor as against his creditors, or in the expectation of ever returning the goods, or ever receiving his money otherwise than by their sale. There is nothing in the evidence to show that the goods were worth more than the price at which he took them; on the contrary, subsequent events show that he allowed for them all that, if not more than, they are really worth. And even if Naylor did intend, at the time, to make an assignment, as he subsequently attempted to do, he had a right to pay off this or any other creditor, if he desired so to do. (Civ. Code, secs. 3432, 3451.) And the creditor accepting payment, either in money or chattels, even with a knowledge of such intent, if he did it *bona fide*, receiving only his just due, and if paid in chattels, at their fair value, and without intent to return them to the debtor, was not guilty of fraud in the transaction. This we find from the evidence to be the fact, in reference to this transaction, so far as the defendant Torrance was concerned; and his conduct in this transaction furnishes no ground for disbarment, as claimed by the complainant.

The evidence is too voluminous to be here given in detail. In some instances it is conflicting, and in many counsel draw inferences in direct conflict with the sworn testimony, assuming that it is false, even though not contradicted. Time and space will not justify us in any lengthy discussion of such conflicts as arise, or of the inferences drawn by counsel on either side. It is a case where we are to find the facts, and in the further discussion of the case we shall content ourselves with a statement of the facts, as we find the truth to be from the evidence, and the inferences which we think we are entitled to draw therefrom.

2. Immediately after the settlement noted in point 1, Naylor asked for Mr. McDonald, whom he had occasionally consulted in legal matters before the formation of the partnership. Mr. McDonald was called from another room to the one occupied by Torrance, and there and then Naylor related to the two—McDonald and Torrance—what had transpired between himself and Heilbronner on the 9th, and Heilbronner's threat to attach if his demands were not complied with. He followed up the statement by declaring that he was unable to raise the money or furnish the security demanded, and stated that he was willing to make an assignment, but would not make one to Heilbronner, as he did not believe that he would treat the other creditors fairly, and said that he owed some two thousand five hundred or three thousand dollars beside what was due to Heilbronner; that he anticipated trouble with Heilbronner if he assigned to anybody else, and he desired to retain them to prepare the necessary papers, and act for him in such future proceedings as Heilbronner might institute in the premises. We do not pretend to give the exact language of the statement, but the substance and legal effect of it. McDonald advised him, instead of making an assignment, to file a petition in insolvency, but this he refused to do. They then told him that they could not afford to take hold of

the matter for any fee that he would be willing to pay, and that he had better get other counsel, but he insisted upon their acting for him, and wanted them to name their fee. They said they would not accept the retainer for less than a thousand dollars, which he thought was too much; also, said that he had no money to pay them, and would have to pay them in goods. To this they demurred, and told him that they would not accept goods from his stock at more than fifty cents on the dollar of what he claimed to be his cost price. With this he went away, saying that he would think the matter over and see them again. At a later hour, either the same day or the next morning, he returned, and said that he would turn over to them goods from his store to the amount of $2,500, at his cost price, in full for their services in his behalf, and of the balance of $327 still due Torrance. This proposition was accepted, and subsequently, and before the assignment, carried out. It is claimed that this was done with a secret understanding, as in the other case, that the goods should ultimately be returned to Naylor, and the money paid instead, but there is no evidence to support such a contention. And, as before, subsequent events show that the goods were not worth over fifty cents on the dollar of the price fixed on them by Naylor, and were not in fact worth the amount of money for which they were received. This retainer being accepted, McDonald dictated to a stenographer a form of assignment to be made by Naylor to one J. T. Fisher, the nominee of Naylor for that position. After this assignment had been written out, it was ascertained that Fisher was absent from the city, and it was uncertain when he would return. Thereupon other names were discussed between Naylor and his counsel, and one or two other persons consulted about accepting the position of assignee, before they found one to accept. At last J. D. Hanbury, whose name was suggested by Torrance, was seen, and consented to act, and his name was substituted

for that of Fisher in the paper, and it was duly executed. The expert who had examined the other goods also examined those delivered under this arrangement, and testified that the wholesale value of the goods on the day they were delivered was $1,533.92 if new, but that in their shop-worn condition they could not have been sold in San Diego at that time for more than fifty per cent of the value, say $766.96. It is claimed that the charging and acceptance of so large a fee, and taking therefor out of the stock of an insolvent debtor so large a quantity of goods, is such evidence of fraud, and of aiding and assisting a fraudulent debtor in cheating, or in an attempt to cheat and defraud, his creditors, as not only justifies but demands the disbarment of the attorneys who did it. As to the nominal amount of the fee, we confess it would seem to be large for the mere work of preparing the assignment papers; but this was not the only service which they took the risk of having to perform under that retainer, and future developments justify the opinion which they then entertained, that it was not the only service they would be compelled to perform. While at Naylor's price the quantity of goods taken was large, at its salable value it was small compared to the amount for which it was accepted. It was not in excess of the balance due Torrance for money loaned, and of a reasonable fee for the service which might reasonably be anticipated in any case of assignment of such a business and such assets. Since attorneys' fees are peculiarly a matter of agreement between the parties, it can hardly be said that the amount actually realized here was such as to render the parties liable to the charge of fraudulent conspiracy, or the attorneys who accepted it liable to disbarment for having accepted it. There is nothing in the evidence to justify the inference that the goods were to be returned at some future time, and the money accepted in lieu thereof, although it is apparent that this is the only way in which the money value for which

they were received can ever be realized by the attorneys. In fact, they offered to return them for six hundred dollars, which was declined.

3. It is charged that the defendants acted as counsel not only for Naylor, but also for Hanbury, the assignee. The evidence does not sustain this charge. Before the assignment Torrance saw Hanbury, and asked him if he would accept the position of assignee, and explained to him the nature of the duties and responsibilities which he would have to assume; and after his appointment he asked the defendants if he could keep the store open and go on with the business, keeping account of the sales and the work done. They told him that they would not object to such a course, but at the same time told him that he must procure and advise with other counsel, and he did so. Afterward, when a civil action was brought against Naylor, Hanbury, these defendants, and others who had received goods, to set aside the assignment and recover the goods that had been transferred, these attorneys were general counsel in the case, in support of the *bona fides* of their client, but it does not appear that they acted as counsel for the assignee in the conduct of his business as such.

4. At the time of their retainer, Naylor told the defendants that Mrs. Dow, a clerk in his store, had been at work there for two years at seventy-five dollars per month; that she was his affianced wife, and had been anxious to make the business a success, and had not drawn any part of her salary; and that he had just paid her off by giving her goods to the amount of eighteen hundred dollars, from the store, and asked them if he had the right so to do. They told him if it was a *bona fide* debt he had the right so to do. It is claimed that these goods were not delivered to Mrs. Dow until after the advice was given; that it was done under the advice of attorneys; that they knew it was not a *bona fide* debt, and the advice was given by the counsel with the intent

to cheat and defraud the creditors of Naylor. The evidence does not support this claim. Defendants and Naylor all testify that when consulted about the matter, the information given to defendants was that the goods had already been delivered to Mrs. Dow; and we think the preponderance of the evidence as to the fact of delivery to her is in favor of the truth of that statement. Defendants knew that she was a clerk in the store, and they had no knowledge as to the *bona fides* of her claim, except the statement made to them at the time of the consultation.

5. It is claimed that other goods beside the amount above mentioned, of the value of some two thousand or two thousand five hundred dollars, were given to and secreted by Mrs. Dow, and never afterward found, and that these were given to her under the advice of the defendants, for the purpose of secreting them, and ultimately securing to Naylor the benefit of them. Whatever may be the fact as to the delivery of these goods, or the intent with which they were delivered, the evidence fails to show that these defendants had any knowledge of the transaction whatever, or any connection with it as advisers or otherwise.

6. It is claimed that at the time of their retainer Naylor was indebted to a local bank, and, as security therefor, had pledged to the bank goods to an amount largely exceeding the indebtedness; that, pending the preparation of the assignment, an order was given to a friend of Naylor, directing the bank to deliver to said friend the goods so pledged upon his paying the amount for which they were held; that this was done under the advice of the defendants, for the purpose of securing to Naylor the benefit of the difference between the value of the goods and the amount of the indebtedness for which the same were pledged in fraud of the rights of creditors. The only ground upon which to base this claim is, that the order is written upon the back of one of the

business cards of the defendants, and therefore presump-
tively in their office. All the defendants deny any
knowledge of the transaction whatever, and there is no
evidence to show that they had any such knowledge or
were consulted on the subject.

7. At the time of accepting this retainer the defend-
ants had in their hands for collection a claim of $80.96
against Naylor, in favor of Ingraham & Co. of San Fran-
cisco, which had been handed to Mr. McDonald by an
attorney of San Francisco in connection with some other
business, and upon which McDonald had before that
time made demand upon Naylor. It appears from un-
contradicted evidence that no other member of the firm
had any knowledge of the fact of this claim being in its
hands at that time, and that at the moment of accepting
the business of Naylor the fact had escaped the memory
of McDonald. It did, however, occur to him before the
assignment was complete, and he tried to make Naylor
pay the claim, but without success. He felt that it was
putting him in an embarrassing position, but he had
already received the confidences of Naylor and his re-
tainer, and could not then refuse to proceed. He had
received no retainer on account of the claim, nor any in-
structions, except to use his best judgment. He had
known for months that a suit against Naylor was likely
to precipitate insolvency, and concluded that, after all,
the next best thing to collection was an assignment for
the benefit of creditors, out of which he then supposed
seventy-five or eighty per cent would be realized. He
subsequently advised the San Francisco attorney by let-
ter of what had been done, and of the connection of his
firm with the assignment proceedings, not claiming for
his firm any benefit of his oversight, but putting it in
the strongest light against themselves, intending, as he
testifies, if the attorney was not satisfied, to make that
claim good themselves. He further said that the attor-
ney had never expressed any dissatisfaction with the

course pursued, and still continued to send his business to the firm. The acceptance of this retainer while they had that claim in hand is charged as one of the acts of unprofessional conduct for which the defendants should be disbarred. The charge is not made or prosecuted by any person interested in the collection of the claim, nor is any such person called as a witness in support thereof. The facts, as above stated, are shown by the sworn testimony, and uncontradicted. To support the charge, there must be shown a union or joint operation of act and intent, and we do not think that the evidence upon this charge is sufficient to support a finding of guilty.

8. In communicating to his counsel the condition of his affairs at or after the time of their retainer, Naylor told them of the inventory which had been made in June, 1888, and sent to his creditors in San Francisco. They asked him if he knew that it was correct, when he said that he supposed so, but was not sure, as it had been written out by one Adams, who took it to San Francisco, and he had never compared it with the original memorandum. They then asked him for the original memorandum, but he said he did not know where it was, as it was entered in some old book which had been used for no other purpose, and he did not then know where it was. A few days after the assignee went into possession, he had the clerk take an account of stock, and when finished took it to the office of the defendants, at their request, to allow them to use it in making up the inventory which the assignor Naylor was required by law to make and file in the office of the county clerk. Upon examining it they found that the pencil entries of this account of stock were made in the same "tickler" which Naylor had used for a like purpose in the June before. There were no other entries in the book, and these two memoranda were in different parts of the book, having no relation with each other; indeed, the assignee did not know what the other entries

were about. After using the new entries in this book for the preparation of the inventory to be verified and filed by the assignor, the assignee came for the book to deliver it to his own counsel.· His attention was then called to the other entries, and it was explained to him what they were, and Torrance told him that they desired to keep that part of the book for the protection of their client, if any question was ever raised as to the accuracy of the inventory which had been sent to San Francisco in June. Hanbury, the assignee, said that he had no use for it (which was true), and that they might do what they pleased with it, but he wanted his own account of stock to hand to his counsel. Thereupon, in his presence, and with his consent, Torrance cut out the leaves covering the memorandum of the account of stock taken in June, 1888, and laid them away, returning the balance of the book to Hanbury.

This transaction is presented as the most serious of the offenses committed by these defendants,—one amounting to a public offense, for which they were liable to public prosecution, and for which they ought to be disbarred.

We do not so consider it. The book had no value as an asset in the hands of the assignee; it was not one of the books of account of the business and property which passed by the assignment, and was not a book which passed or belonged to the assignee. As the assignee found it, it contained no entry or record of value or interest to him or to the creditors,—in fact, it was unintelligible to them, and useful only to Naylor. To him it might or might not become useful, not only as a means of verifying the accuracy of an inventory which had not been written out by himself, but which had been transmitted to his creditors, but also as a means of tracing goods which had in the mean time been disposed of by Adams, the man who made up the June inventory

from this memorandum, and with whom no accounting had yet been had. It was not an "invoice-book," or a book of record, public or private. It was a mere private memorandum; was not taken to be destroyed, and was not destroyed, but the severed leaves were preserved, and when called for were promptly produced, offered in evidence, and filed as an exhibit in this cause. There has been no attempt made to use them for any fraudulent purpose, and the evidence fails to show that they were taken or removed for any such purpose, or with any such intent. There is some evidence tending to show that the fact of their removal was attempted to be used as a means of extorting a large sum of money from these defendants, in default of the payment of which this proceeding would be prosecuted; but the only connection of these defendants with that attempt was a refusal to yield to the demand. For this refusal they are not punishable at the hands of this court, and we do not think that the removal of these leaves from the covers between which they were found, and the subsequent preservation and use that was made of them, constitutes a violation of their oaths or of their duties as attorneys and counselors.

9. It is further charged that the defendants corruptly attempted to induce Mr. Hunsaker, local counsel of creditors of Naylor at San Diego, to withdraw from the prosecution of the action brought to set aside the assignment, and for other relief, against Naylor and others. The evidence fails to sustain the charge.

Some other, and to our minds minor, points are made against the professional conduct of defendants, but those noted are all that are material to be discussed here.

Our conclusion from the entire evidence is, that the defendants are not guilty of unprofessional conduct, to wit, the violation of their oaths and of their duties as attorneys and counselors; and it is ordered and adjudged

that this proceeding be dismissed, and that defendants have judgment for their costs against the complainant.

SHARPSTEIN, J., PATERSON, J., THORNTON, J., and Mc-FARLAND, J., concurred.

Rehearing denied.