[Civ. No. 1214.  Third Appellate District.—June 4, 1914.]

PARKINSON BROTHERS COMPANY (a Corporation), Plaintiff, Cross-Defendant and Respondent, v. FRED H. FIGEL, Defendant and Respondent, HENRY COWELL LIME & CEMENT COMPANY (a Corporation), Defendant, Cross-Defendant and Appellant, WILL M. BEGGS, Defendant, Cross-Plaintiff and Respondent.

FRAUDULENT ASSIGNMENT—ATTACHED FUND—NECESSITY THAT ATTACH-ING CREDITOR FIRST RECOVER JUDGMENT.—Where all parties in a suit to determine the ownership of an attached fund submit to an inquiry as to whether the assignment of the fund was fraudulent, and the court makes findings on the issue, an objection that the attaching creditor had no standing to attack the assignment because of not having recovered judgment against the debtor cannot be raised on appeal.

ID.—ATTACK UPON ASSIGNMENT AS FRAUDULENT—BURDEN OF PROOF.—In an action attacking as fraudulent an assignment of an attached fund, the burden of establishing the insolvency of the debtor at the time of the assignment, as well as the charge of fraud, is upon the attaching creditor.

ID.—FINDING AGAINST FRAUDULENT ASSIGNMENT—SUFFICIENCY OF EVI-DENCE.—In this action to determine the ownership of an attached account, as between an attaching creditor and a prior assignee thereof, the finding that the assignment was not fraudulent is sup-ported by the evidence.

ID.—ASSIGNMENT TO ATTORNEY FOR PAST AND FUTURE SERVICES.—The assignment was not invalid because made to the debtor's attorney, and for future as well as past services.

ID.—PREFERENCE OF CREDITORS—DISPOSITION OF SURPLUS.—The law per-mits a debtor to make an assignment of some of his outstanding accounts for the benefit of his attorney, and out of the surplus to pay certain creditors by way of compromising, where possible, their claims for damages.

APPEAL from a judgment of the Superior Court of Santa Clara County.  John E. Richards, Judge.

The facts are stated in the opinion of the court.

Mastick & Partridge, for Appellant.

R. C. McComish, E. M. Ray, and A. A. Caldwell, for Re-spondent Beggs.

CHIPMAN, P. J.—The action was brought by plaintiff to have the rights of the several defendants determined to certain money held by plaintiff. It is alleged that plaintiff (herein referred to as Parkinson Company) and defendant Henry Cowell Lime & Cement Company (herein referred to· as the Cement Company) are corporations; that the Cement Company has commenced an action in the superior court of Santa Clara County against defendant Fred H. Figel and in said action a writ of attachment has been issued and served by the sheriff of said county upon this plaintiff, with a notice that all goods, etc., in the hands of plaintiff belonging to said Figel are attached; that before the said attachment plaintiff purchased from said Figel certain cement and other building materials for which plaintiff agreed to pay the sum of $304.20, no part of which has been paid; that said defendant Beggs claims to be entitled to receive said money from this plaintiff by virtue of a valid assignment from said Figel to him. Defendant Beggs filed an answer denying the averments of the complaint respecting the said action of the Cement Company and further answering, by way of cross-complaint, alleged: That the said money held by plaintiff belongs to cross-plaintiff; that, prior to the commencement of this action and prior to any claim upon said money by the Cement Company and after the sale and delivery of said goods to Figel, he, the said Figel, for a valuable consideration, assigned to cross-plaintiff said demand against said Parkinson Company; that the Cement Company claims some interest therein but without right. The Cement Company filed an amended answer to the cross-answer of Beggs: Denies that plaintiff has in its possession the said sum of $304.20 or any other sum belonging to cross-plaintiff; admits the sale of said goods to plaintiff; denies the assignment of said claim as alleged by cross-plaintiff; alleges that the writ of atachment was issued and served as alleged by plaintiff and that it has never been released and, upon information, alleges that it was served prior to any assignment by Figel to Beggs. As a further answer, alleges: That prior to the commencement of this action, Figel was indebted to the Cement Company in the sum of about thirty thousand dollars, for the recovery of which said company had commenced an action in said court; that at said time a writ of attachment was duly issued and was regularly served on

said Parkinson Company; that· by virtue of said writ the sheriff of said county "levied on all profits, assets and things of value belonging to or standing in the name of said Fred H. Figel" and the said Cement Company, its agents and attorneys, made diligent search for any property belonging to said Figel, without avail, "except that property levied on by the said sheriff of said county under said writ and upon information alleges that said Figel had no property or assets save such as were levied upon" and certain accounts fraudulently assigned to the said Will M. Beggs, as hereinafter set forth more fully; that the total value of all money, property, assets, and things of value so levied upon, together with the accounts so assigned to said Will M. Beggs, is less than the ·debt due from said Fred H. Figel to the said Cement Company in the sum of fifteen thousand dollars and that at the time of said assignment to said Beggs the said Figel was insolvent; that said Beggs is now and at all times herein mentioned he was the attorney of record for the said Figel and was such attorney at the time of said alleged assignment. It is then alleged that, with intent to defraud the said Cement Company, Figel concealed, so far as he could, all of his assets and, on information and belief, alleges that said Figel and Beggs conspired together to defraud said Cement Company in pursuance of which Figel falsely pretended to make an assignment of the amount due from said Parkinson Company and furthermore, that said assignment was without consideration "and was made after the levy of said attachment, and was dated prior thereto, in pursuance of said false and fraudulent conspiracy"; that at said time, in pursuance of said conspiracy, Figel executed assignments to said Beggs amounting to $8,516.20, all of which were made for the said fraudulent purposes.

Defendant Figel answered plaintiff's complaint admitting its averments and alleging that, prior to any levy of attachment, plaintiff was informed by defendant Figel that said account had been assigned to said Beggs.

The court made findings that the averments of the complaint were true; that the sum of $304.20, in possession of the clerk, deposited by plaintiff, belongs to defendant Beggs; that prior to the commencement of this action and after the sale and delivery of the goods, Figel, "for a valuable consideration, sold, set over and assigned to Will M. Beggs, the said

demand'' and the money due thereunder and that the claim
of the Cement Company thereto is without right; that said
assignment was made on March 28, 1911, and the said attach-
ment was levied on March 31, 1911; that, prior to the com-
mencement of this action, said Cement Company claimed that
Figel was indebted to it in the sum of about thirty thousand
dollars and had commenced suit against him to recover said
sum of money, but that Figel had filed a verified answer
thereto denying that he owed said sum or any other sum of
money to said Cement Company; that at the time said com-
plaint was filed attachment was served on said money in the
hands of said Parkinson Company due from said Figel; that
under said writ the sheriff levied upon all property, assets, and
things of value belonging to or standing in the name of Figel,
but that Figel ''did not have, and has not now, any money,
property, assets or things of value belonging to him, or stand-
ing in his name, other than those levied upon by said writ, and
certain accounts assigned to Will M. Beggs,'' all of which, so
levied upon, amounted in value to less than the amount
claimed to be due from the said Figel to said Cement Com-
pany; that at the time of said assignment Figel was solvent
and able to pay his debts in the regular course of business and
that said Beggs is now and at all times in this action men-
tioned was the regular attorney and counselor of the said
Figel; that said Figel ''has not in any manner concealed any
of his assets or things of value so as to render nugatory any
judgment which may be given against him in favor of'' the
Cement Company, ''nor for any other purpose; nor did the
said Figel and said Beggs, or either of them, conspire or con-
nive together, or with any other person, to defraud'' the said
Cement Company, ''or at all; nor did the said Figel falsely
pretend to make an assignment of the amount due from the
said'' Parkinson company, ''to the said Will M. Beggs; nor
did the said Beggs falsely or fraudulently agree to accept,
nor did he accept the said assignment for the purpose of de-
ceiving the said'' Cement Company; ''but the fact is that
there was a good and valuable and valid consideration for the
assignment, and it was made before the commencement of the
action of'' the Cement Company, against Figel ''and was
dated on the date it was made, and was, in all respects, a valid
and *bona fide* transaction.''

As conclusion of law the court found that defendant and cross-plaintiff Beggs was entitled to recover the money deposited by plaintiff and rendered judgment accordingly. It is from this judgment defendant, the Cement Company, appeals on bill of exceptions. No motion for new trial was made. The sufficiency of the evidence to support the findings is challenged; that there was a good and valuable consideration for said assignment; that the assignment was not fraudulently made; that Figel was solvent at the time he made the assignment; that he made no concealment of his assets; and that neither he nor Beggs conspired to defraud the Cement Company.

The findings support the judgment and we are only to inquire whether there is sufficient evidence to support the findings.

Appellant presents the following points: 1. That the circumstances all show that the assignment was fraudulent and a mere subterfuge to deprive the Cement Company of the money due it; 2. The assignment for future services was void against creditors; 3. A transfer to a creditor largely in excess of his demand, with an undertaking that the surplus is to be returned to the principal, is fraudulent and void; 4. That the evidence is that Figel assigned the accounts because he thought Beggs could collect them more readily than Figel could, and hence being for the benefit of the assignor, is void as against creditors; 5. If any part of the assignment is for a consideration which the law does not permit, the whole assignment is void; 6. The assignments, if *bona fide* at all, are really for the benefit of creditors, and as such, are void for failure to comply with the code.

Respondent, Beggs, makes the point, as conclusive of the controversy—That appellant has no standing in court to attack the conveyance from Figel to Beggs for the reason that it had no judgment, but only an attachment on a disputed claim, against Figel. The question has been many times considered by the courts of this country and not with harmonious results. In an extended note to *Ziska* v. *Ziska*, (Okl.), 23 L. R. A., New Series, page 1, many, but by no means all of the cases, are collated. Subject to some exceptions, the rule is undoubtedly as claimed by respondent. (3 Pomeroy's Equity Jurisprudence, sec. 1415.) The subject was quite

fully considered in *Aigeltinger* v. *Einstein,* 143 Cal. 609, [101 Am. St. Rep. 131, 77 Pac. 669], and the cases decided by our supreme court up to that time (1904) were examined. Among the later cases is that of *Lyden* v. *Spohn-Patrick Co.,* 155 Cal. 177, 183 [100 Pac. 236], in which the rule is reaffirmed.

It appears, however, that all parties without objection submitted to an enquiry into the validity of the assignment to Beggs and the court made full findings on the issues. Neither by demurrer to the answer of the Cement Company, alleging fraud, nor by objection to the evidence touching the alleged fraudulent conveyance to Beggs, was the question raised. Under such circumstances, we do not think the respondent Beggs should be permitted to rely solely on the point just discussed, nor need it be definitely decided. Having consented to an examination into the validity of the Figel assignment, appellant is entitled to a review of the question whether the evidence is sufficient to support the findings.

Figel is a dealer in lime, cement, and other building material at San Jose. The Cement Company is a manufacturer of lime and cement and claimed that Figel was indebted to it in the sum of thirty thousand dollars for materials sold to him prior to March 28, 1911. The Cement Company guaranteed the lime against what is called "pitting" or "popping." This lime was for plastering purposes. Witness, Dr. L. J. Belknap, testified to serious damage suffered by him in using the lime purchased from Figel. Explaining the meaning of the term "popping," he testified: "There are little bits that pop out from the size of perhaps the head of a pin up to the size of a quarter. In some cases half an inch that chip out by something in the slacking." The effect of this "popping" was such that where it occurred the walls had to be scraped and replastered. A number of persons, who had used this lime, were making claims against Figel for damages and among them some six or more contractors, amounting to more than eight thousand dollars. These claims were brought to the attention of the Cement Company by Figel. There was also a pending controversy about cement sold to the state by Figel who had brought suit against the state for $5,386.06, and Figel informed the Cement Company that he would expect it to stand back of him in this suit. Figel did not deny that the Cement Company's claim

amounted to thirty thousand dollars, but he wrote them and said, among other things: "I do not now, nor never did recognize that I owed you this amount of money. You are well aware of the fact that many claims are being made by the contractors here growing out of the popping lime, and I will expect you to make me whole on any loss occasioned from that source." The evidence shows that these controversies were pending before and at the time the Cement Company commenced its action against Figel and that Figel was making an honest effort to meet its demands but was seriously hampered by conditions chargeable, at least in considerable part, to the Cement Company.

Figel believed, and the evidence shows that he was justified in his belief, that it was necessary for him to employ attorneys and he engaged Messrs. Beggs & McComish. They entered upon their employment and were rendering various services some time before the assignment. There was no definite understanding as to their fees except that Figel was told the fee in the suit against the state would be at least one thousand dollars and expenses. Figel had on hand between one thousand five hundred dollars and two thousand dollars and, in reply to the question why he did not use this money to pay his attorneys, he testified that he needed it to carry on his business and to meet current obligations. He testified that he needed attorneys not only to look after matters in litigation but to assist in the collection of outstanding accounts and that it was to secure his attorneys for their services performed and to be performed that he made the assignment to Mr. Beggs. This assignment embraced a number of claims aggregating $8.516.20, among them the one here involved against plaintiff for $304.20 and one involved in another case for $1,162.71, against Charles R. Parkinson Co., which, by stipulation, is to be considered on the transcript in the present case. Figel was called as a witness by defendant, Cement Company, and it is upon his testimony and upon the cross-examination of Mr. Beggs that the objections now urged to the judgment by appellant are chiefly based. Figel was examined at great length and with much minuteness as to the extent and character of his business, his relations to his assignee, Beggs, and his financial condition at the time of the assignment.

Mr. Beggs testified, on his cross-examination: "The consideration for that assignment is for several purposes; primarily to pay me for legal services, me and Mr. McComish for legal services already rendered and to be rendered for him, and costs and expenses of litigation." He was asked what services he had rendered Figel prior to March 28 and answered: "Considerable. I can't say the exact amount, but very many consultations; a suit had been brought in his favor against the state of California for some $6,000 in round figures, upon which nothing had been paid, for a fee; all of his affairs had been gone into, and they were considerable; had taken up both my time and Mr. McComish's for upwards of a month before this, or more, for quite a long time; I can't say the exact time, but quite a long time, and by this time they were getting very strenuous. Q. At that time did you expect an attachment by the Cowell Company? A. No, sir, not an attachment; we expected a suit but not an attachment." When asked if he knew whether Figel had any money or property, he answered: "Oh, I knew he had large assets." As to his fee for services he testified: "At the time of the assignment I did not have an agreement with Mr. Figel for a definite sum as to the amount of fees I was to receive. There was absolutely no definite sum agreed upon. I communicated to him approximately what it would be, about. In the state case that had already been filed, at least a thousand dollars, and whatever the expenses would be in addition to that; and there were a large number of other cases threatened that would be proportionately; the Engstrom company was threatening to sue Mr. Figel for four or five thousand dollars damages; and there were at least six other people outside of Cowell threatening to litigate certain claims that they had against Mr. Figel for considerable sums of money." The suits last referred to were for damages caused by using this "popping" lime. He presented a list of the assigned claims and testified that they were all assigned to him on March 28, 1911. Being asked whether the assignment was for future services, he answered that it was not. "Q. What did he give them to you for? A. For not only the services that I had rendered up to that time—or rather Mr. McComish and I had rendered, and for any other attorneys that would be necessary to employ in any of the litigation that was threatened in

several directions and in several places, the expenses of that litigation, and damages that were claimed from various customers of Mr. Figel growing out of popping lime jobs.    Q. Why was he turning money over to you to pay for damages that might result from suits brought against him by other people?    A. I can't say; that is what was done; these claims had to be paid as soon as they were definitely settled, and I was authorized to settle them, and we proceeded to do so.    I have settled some.    The claim of the Engstrom Company which as presented was some four or five thousand dollars was settled for between twenty-one hundred and twenty-two hundred dollars.    What money was paid was money collected out of these assignments. . . . There was a hundred dollars paid to a man named Herman, paid out of money collected on these assignments.    Q. What else?    A. I think those are the only actual sums of money that I paid out of these collected. There are quite a number that are in dispute, and as soon as the amounts are definitely fixed they are going to be paid; we are trying to get them down low.    Q. Which ones are in dispute?    A. Well, there is Dr. Belknap, in East San Jose, who is raising some new claims; there is the First National Bank in this city, raising some very large claims; it runs up into the thousands; there is Dr. Osborne, out at Santa Clara, also raising claims; there are several others that I just don't have in mind now. . . . Q. Well, now, when you took these assignments did you agree to pay the damages that people might make for popping?    A. The understanding, as I understood it, was this: That out of these moneys as they were collected the costs and expenses of any litigation that Mr. Figel might have, should first be paid, including the attorneys' fees; the surplus should be used so far as it could be to pay off any judgments for damages or any claims that might be settled, growing out of these popping lime claims; and the surplus, if any, should be then paid Mr. Figel.    Q. Some of these claims, you say, the bank amounted to thousands of dollars?    A. Yes. Q. More money than you got?    A. Well, no, not more.    I am in hopes that it will be cut down, that is why they have not yet been paid.    The First National Bank wants a very large sum of money paid.    Q. But supposing you have to pay the First National Bank, what do you get?    A. I get mine first. Q. How much do you get first?    A. I can tell you after it is

collected and after the work is performed.   Q. You cannot tell?   A. I cannot tell.''

It appears from Bèggs's testimony that he had collected of these assigned accounts $3,667.66, and had paid out in settlement of three of the "popping" claims $2,580.00, leaving in his hands $1,087.66 and the uncollected claims amounting to $4,848.54.   Several contractors and others were called as witnesses who had claims for damages, from whose testimony it appears at least problematical whether any surplus will remain to come back to Figel after claims for damages are paid and his attorneys settled with, even if Mr. Beggs should succeed in collecting the balance of the accounts assigned to him, and whatever that balance may be is secured to the Cement Company by its attachment.   In fact, except as to what may be the attorney's fees, the Cement Company is getting the benefit of all these assigned claims by the money being used to discharge liabilities for which it is answerable. Figel explained at some length why he found it necessary to employ attorneys and his explanation seems reasonable. Speaking of the assignment to Beggs, he testified: "I went through my books and I picked out those accounts that were kind of long-winded coming in.   I did not give them any nice, good accounts because I needed that money to pay your client with you see? (addressing the Cement Company's attorney, interrogator) ; I kept paying your client all my ready cash, and I depended upon Mr. Beggs and Mr. McComish to make good on those popping lime jobs.   I did not expect them to work for nothing; and that is how I came to make the assignment.''   He testified that he had paid the Cement Company $10,000.00 on its account, reducing it to about $30,000.00. We cannot undertake to give even an epitome of the succeeding hundred folios of Figel's testimony.   He was required to bring his books into court and explain in detail everything pertaining to his accounts and to explain over and over again why he found it necessary to employ attorneys and to assign to Beggs the accounts mentioned.   We have failed to discover in his answers and explanations any sound reason for holding that the conclusions reached by the learned trial judge as to the *bona fides* of the transaction were unsupported by sufficient evidence.   Figel made no concealment of what he was doing but gave notice of the assignment to the several persons

concerned before the Cement Company commenced its action. Nor can we say that evidence was wanting to justify the finding that Figel and Beggs did not conspire to defraud the Cement Company. Figel's troubles arose out of defective material purchased from that company which it had guaranteed and his efforts to settle the claims arising from its use by Figel's customers was a duty placed upon him the dicharge of which the Cement Company should have encouraged rather than retarded.

In its finding that Figel was solvent at the time said assignment was made, the court doubtless took into consideration, as it very properly could, the amount of offsets to the Cement Company's claim which the evidence showed would, in all probability, be successfully urged. Figel testified that he owed no debts except this claim of the Cement Company and none were disclosed by his books. He had an established business which had some value though no price was put upon it. Aside from any good will, he showed visible assets in excess of the amount which would be due the Cement Company after it made good the losses claimed by Figel to be justly chargeable to the Cement Company. The burden of establishing his insolvency at the time of the assignment was on the Cement Company, as was the charge of fraud, and both should have been shown by clear and satisfactory evidence to have warranted a finding favorable to defendant's contention. Although the offsets to the Cement Company's claim were in some degree contingent and uncertain as to their amount, we do not think the trial court would have been justified in disregarding them in order to find Figel insolvent.

It is urged that because the assignee was Figel's attorney and the assignment was for future services it is void against creditors. Some of the services were rendered before the assignment and the assignor had a right to secure the services rendered and to be rendered. (*Morrell* v. *Miller,* 28 Or. 354, [43 Pac. 490, 493, 45 Pac. 246]; *In re Luce,* 83 Cal. 303, [23 Pac. 350].) Figel's principal object by the assignment was first, to secure his attorneys for their services, which he had a right to do, and second, to have the proceeds used to settle the "popping" claims as to which both Figel and the Cement Company were liable. That any surplus should come to him would be implied had it not been so understood. The fact that

Figel thought Beggs a better collector than himself was not the motive for the assignment. Incidentally he may have so thought but we cannot see that this element in the transaction is of serious consequence.

Nor does it appear to us that any part of the assignment was void and thus, had it been true, making applicable the rule, if it is the rule, contended for, that the entire assignment is void. Figel could, as we have seen, secure his attorneys, and he had a right to make some provision to settle those harassing "popping" claims. Respondent cannot complain should there be a surplus for it is secured to respondent by its attachment.

No attempt was made to assign these claims for the benefit of all creditors nor was there an assignment of all of Figel's property—not even all his outstanding accounts. It was not a general assignment such as in *Sabichi* v. *Chase,* 108 Cal. 86, [41 Pac. 29]; cited by appellant. At most it was an assignment for the benefit of his attorneys and to pay certain creditors by way of compromising, where possible, their claims for damages. Such an assignment the law permits. (In the *Matter of Muller* v. *Kennedy,* 118 Cal. 432, [50 Pac. 660]; *Heath* v. *Wilson,* 139 Cal. 362, [73 Pac. 182].) It seems to us that the evidence shows that Figel was proceeding under sections 3431 and 3432 of the Civil Code, if he had the code in mind at all, and not, as claimed by appellant, under section 3449 et seq., and that the assignment, though preferring a creditor, was, therefore, valid. (See cases last above cited; also, *Lawrence* v. *Neff,* 41 Cal. 566; approved in *Wood* v. *Franks,* 67 Cal. 32, [7 Pac. 50]; *Saunderson* v. *Broadwell,* 82 Cal. 132, [23 Pac. 36]; and in *Heath* v. *Wilson,* 139 Cal. 362, [73 Pac. 182]. See, also, *Roberts* v. *Burr,* 135 Cal. 156, [67 Pac. 46]; *Crane Co.* v. *Dryer,* 9 Cal. App. 290, [98 Pac. 1072].)

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.