[L.A. No. 32207. Dec. 10, 1987.]

MARVIN B. KAPELUS, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

180

## COUNSEL

Otto M. Kaus, Dan Marmalefsky and Hufstedler, Miller, Carlson & Beardsley for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Richard J. Zanassi and Vida M. Holquin for Respondent.

## OPINION

**THE COURT.\*** —This is a proceeding to review the unanimous recommendation of the Review Department of the State Bar Court that petitioner Marvin B. Kapelus be disbarred. The recommendation is based on findings in two separate matters, one involving petitioner's alleged misconduct in the representation of a client in an employment dispute (the Hammer matter), and the other involving alleged conflicts of interest arising from petitioner's personal participation, and representation of multiple parties, in a tax reduction plan (the LAPSC matter). After a consolidated hearing, the State Bar hearing panel issued detailed findings which are described below, and unanimously recommended that disciplinary sanctions, including an actual suspension of 60 days, be imposed. The review department largely adopted the hearing panel's findings, but not its recommended discipline, recommending instead that petitioner be disbarred in view of (1) the misconduct at issue here, (2) his lack of remorse and (3) his record of two prior disciplinary sanctions. As explained below, we conclude that we should adopt the review department's recommendation of disbarment.

I.

■ Because petitioner challenges many of the State Bar's findings, we begin with a brief review of the principles which govern this court's role in State Bar disciplinary proceedings. It is well established that the State Bar's findings are not binding on this court. Instead, this court must independently review the evidence, pass upon its sufficiency, and resolve all reasonable doubts in favor of the attorney. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 12 [206 Cal.Rptr. 373, 686 P.2d 1177].) The findings, however, must be given

---

\*Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kline (J. Anthony), J.†

†Presiding Justice, Court of Appeal, First Appellate District, Division Two, assigned by the Chairperson of the Judicial Council.

great weight, and " ' "[w]hen the findings . . . rest primarily on testimonial evidence, we are reluctant to reverse the decision of the local administrative committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony . . . ." ' " (*Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 852 [100 Cal.Rptr. 713, 494 P.2d 1257]; *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82].) Moreover, petitioner bears the burden of showing that the findings of the State Bar are not supported by the evidence. (*Trousil* v. *State Bar* (1985) 38 Cal.3d 337, 341 [211 Cal.Rptr. 525, 695 P.2d 1066].) "In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty." (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993]; *Chefsky* v. *State Bar, supra,* 36 Cal.3d 116, 121).[1]

## II.  *The Hammer Matter*

In August 1977 and March 1978, Robert Hammer met with petitioner to discuss an appeal that Hammer was then pursuing before the United States Merit Systems Protection Board relating to his discharge from employment with the federal government. Petitioner testified that he agreed to assist Hammer's nonattorney representative of record, William Shoates, by writing a supplemental letter in Hammer's defense to the appeals board in Washington. Petitioner also acknowledged that he and Hammer discussed petitioner's filing a lawsuit on Hammer's behalf against the government in federal court at the conclusion of Hammer's appeal, although petitioner maintains that he said he would file the action only if Hammer won the administrative appeal, while Hammer testified that petitioner agreed to file the action regardless of the appeal's disposition.[2] Shortly after the August 1977 meeting, petitioner asked for and received $600 from Hammer, which Hammer thought was a retainer for the post-appeal suit. Petitioner testified

---

[1] Although the concurring and dissenting opinion takes issue with some of these familiar principles, this standard of review has been applied by this court in State Bar proceedings for many years and the Legislature has never indicated any disagreement with this approach. The statement that "reasonable doubts" in the evidence should be resolved in favor of the attorney is simply a corollary to the well established rule that the State Bar bears the burden of proving charges of unprofessional conduct under a "clear and convincing evidence" standard. (See, e.g., *Guzzetta* v. *State Bar* (1987) 43 Cal.3d 962, 968, fn. 2 [239 Cal.Rptr. 675, 741 P.2d 172].) Contrary to the suggestion of the concurring and dissenting opinion, attorneys are not accorded special treatment in this regard; a similar "clear and convincing evidence" standard applies to other, nonattorney license revocation proceedings. (See *Ettinger* v. *Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856 [185 Cal.Rptr. 601].)

[2] Petitioner characterizes this lawsuit as a "*Bivens* action," under *Bivens* v. *Six Unnamed Federal Agents* (1971) 403 U.S. 388 [29 L.Ed.2d 619, 91 S.Ct. 1999]. *Bivens* established the right to sue to recover damages against agents acting under color of federal authority. In the instant case, petitioner considered filing a suit for damages against Hammer's federal employers for slandering Hammer.

that the $600 was his fee for reviewing the administrative record and writing the letter to the appeals board. (Hammer has since recovered the fee in small claims court.)

Petitioner wrote the supplemental letter, a three-page legal defense of Hammer, and sent it to the appeals board on March 28, 1978. Although Shoates continued to be Hammer's representative of record for the appeal, petitioner wrote the letter on his attorney letterhead and signed his name as attorney for Hammer. Petitioner testified that his signing as Hammer's attorney was inadvertent.

The appeals board resolved the appeal against Hammer in the beginning of February 1980. On February 6, 1980, the board sent one copy of the letter of denial to Hammer in care of petitioner at petitioner's address; a second copy was sent to Shoates. Although the copy of the letter delivered to petitioner was clearly addressed to Hammer, the letter never reached him and Hammer did not learn that his appeal had been denied until June 1980, when he independently contacted the appeals board and, on June 24, was sent a copy of the denial letter.

On June 27, 1980, Hammer tried several times to reach petitioner by phone. He was told by petitioner's secretary that petitioner was either unavailable or out of the office. Suspecting that petitioner was avoiding his calls, Hammer devised a ruse and succeeded in speaking directly to petitioner. At that point, petitioner confirmed that Hammer's appeal had been denied and told Hammer he had attempted to reach him by phone on a number of occasions and had sent several letters to Hammer which had been returned as undeliverable and had been placed in Hammer's file. Hammer asked for his file and petitioner promised to send it to him.

When he did not receive the file, Hammer called petitioner twice and sent him a registered letter asking for the file, but petitioner neither replied nor sent the file. In August 1980, Hammer consulted another attorney, Donald Townley, who sent petitioner a letter on September 26, 1980, requesting Hammer's file. The file was picked up by Townley's service on November 11, 1980, but the transcript of the initial administrative hearing was not in the file and there were no letters in the file addressed to Hammer which had been returned to petitioner as undeliverable. Townley subsequently asked petitioner on several occasions to forward the administrative transcript to him, but petitioner never responded to the requests. At the State Bar hearing, petitioner testified that he had earlier returned the transcript to Shoates, but although Shoates did not testify at the hearing, it was stipulated that he would have testified that he never received the transcript back

from petitioner. Townley eventually sent for a copy of the transcript from the appeals board.

On the basis of the above evidence, the hearing panel found, inter alia, that petitioner willfully withdrew from employment without taking reasonable steps to avoid foreseeable prejudice to his client in violation of rule 2-111 of the Rules of Professional Conduct,[3] and willfully failed to use reasonable diligence in performing services by failing to communicate with Hammer regarding the status of his case in violation of former rule 6-101.[4] Although petitioner challenges both findings, we conclude that they should be sustained.

### A. *Withdrawal from employment*

Petitioner contends initially that the evidence fails to support the finding that he willfully withdrew from employment without taking reasonable steps to avoid foreseeable prejudice to his client's interest. He asserts, first, that the evidence does not demonstrate that he ever entered into an attorney-client relationship with Hammer, and, second, that even if he did enter such a relationship, the objective of the representation was never clearly established.

Hammer testified quite emphatically, however, that petitioner agreed to represent him in a post-administrative appeal suit against the federal government, and the hearing panel—which observed the testimony of both Hammer and petitioner—found Hammer's testimony credible; we find no basis for rejecting that assessment. In addition, the $600 payment which petitioner received from Hammer provides additional support for the conclusion that petitioner had been retained at that point to represent Hammer in a legal capacity.

Although the record leaves some question as to the exact terms of the agreement between petitioner and Hammer—i.e., whether petitioner was to file a federal *Bivens* action (see fn. 2, *ante*, p. 184) regardless of the outcome

---

[3]Rule 2-111 provides in relevant part: ". . . [A] member of the State Bar shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules."

Hereafter, all references to rules are to the Rules of Professional Conduct of the State Bar of California.

[4]Former rule 6-101 provided in relevant part: "A member of the State Bar shall not willfully . . . [f]ail to use reasonable diligence and his best judgment in the exercise of his skill and in the application of his learning in an effort to accomplish, with reasonable speed, the purpose for which he is employed."

of the administrative appeal or whether he was to file such an action only if Hammer won the appeal—in either case the evidence supports the conclusion that petitioner improperly withdrew from employment without taking reasonable steps to avoid prejudice to his client. When petitioner received notice in February 1980 that Hammer's appeal had been denied by the appeals review board, he should have recognized that under federal law the appeals board decision was not final but was subject to judicial review if a petition were filed in federal court within 30 days of receipt of the appeals board decision. (5 U.S.C. § 7703(b)(1).) By failing to notify Hammer of the adverse decision and failing to ascertain whether Hammer wanted to seek judicial review, petitioner foreclosed any opportunity Hammer had to prevail in the administrative appeal and, perhaps, in any subsequent *Bivens* action. Because petitioner failed to act at that point, and did not even speak to Hammer until Hammer—through a ruse—was finally able to reach him by phone several months later, we conclude that the evidence supports the finding that petitioner withdrew from employment without taking reasonable steps to avoid prejudicing his client.[5]

This conclusion is buttressed by the evidence which suggests that petitioner falsely told Hammer that he (petitioner) had unsuccessfully attempted to notify Hammer of the appeals board decision. As noted, although petitioner told Hammer in June that he had sent numerous letters to Hammer that had been returned as undeliverable and placed in Hammer's file, when the file was finally delivered to Hammer's new attorney no such letters were found. Under the circumstances, we conclude that the evidence supports the finding that petitioner abandoned his client without taking reasonable steps to protect him from prejudice.

B.   *Failure to communicate with client*

■   Petitioner also contends that the evidence does not support the finding that he "willfully" failed to communicate with Hammer, suggesting that any failure to communicate was simply the result of negligence by his

---

[5] Petitioner at oral argument argued that Hammer was not prejudiced by receiving late notice of the denial of the appeals board decision, since the 30-day period of 5 United States Code section 7703(b)(1) only commences to run upon personal receipt by the claimant of the appeals board decision, and service upon one's attorney is not sufficient to start the 30-day period. (*Kumferman* v. *Department of Navy* (Fed.Cir. 1986) 785 F.2d 286, 289.) Petitioner's argument is meritless. The record shows that petitioner never advised Hammer of the 30-day statute, nor of his right even to seek judicial review of the appeals board decision, so the fact that Hammer may have had 30 days from the date of his receipt of the decision—on or about June 24, 1980—to file a petition for review does not absolve petitioner of responsibility for Hammer's loss of the opportunity to obtain judicial review. It was not until September 1981, more than one year after the expiration of the thirty-day period for review, that Hammer learned from another attorney that his claim was time-barred.

office staff in failing to forward the appeals board decision to Hammer. Even if we assume that such office-staff negligence was responsible for petitioner's initial failure to promptly forward the appeals board decision to Hammer—though that was not petitioner's explanation when he spoke to Hammer on June 27—the evidence clearly supports the conclusion that thereafter petitioner willfully failed to communicate with Hammer. Contrary to petitioner's contention, the evidence of failure to communicate is not limited to petitioner's conduct in initially refusing Hammer's calls on June 27, but extends to his failure to respond to Hammer's subsequent phone calls and registered letter inquiring into petitioner's failure to send the file to Hammer. Indeed, petitioner's willful failure to communicate is further demonstrated by his additional failure to respond to the later requests of Hammer's new counsel for the missing administrative hearing transcript; even if, as petitioner testified, he had earlier returned the transcript to Shoates, there was no excuse for petitioner's failure to inform Hammer's new attorney of that fact. In any event, past cases make it clear that an attorney's repeated failure to communicate with and inattention to the needs of a client—like that involved in this case—is a proper ground for discipline, even if the attorney's conduct is not willful. (See, e.g., *McMorris v. State Bar* (1981) 29 Cal.3d 96, 99 [171 Cal.Rptr. 829, 623 P.2d 781].)

In sum, we conclude that the evidence supports the finding that petitioner's conduct in connection with the Hammer matter constitutes a proper basis for discipline.

### III. *The LAPSC Matter*

The second matter at issue concerns petitioner's involvement in a tax reduction plan. In 1969 petitioner began representing the Los Angeles Psycho-Social Center (LAPSC), a charitable nonprofit corporation involved in educational and psychological research. That same year, petitioner and Cary Harwin, a nonattorney business manager, devised a complex business transaction involving LAPSC designed to take advantage of numerous tax provisions. Petitioner and Harwin formed and acted as general partners for three limited partnerships known as the Pelwin, Kapwin and Lushar Land Companies (PKL). Petitioner, as attorney, drafted the legal instruments setting up PKL, including the loan documents described hereafter.

Pursuant to the plan, investors who were limited partners in PKL made charitable contributions to LAPSC. With petitioner's advice, LAPSC then loaned between 85 and 90 percent of these contributions to PKL. On receipt of the loan, PKL purchased shares in the Tucker Land Company (Tucker), a public limited partnership in the business of real estate development. Tucker's principal asset was 1,800 acres of land in the Santa Monica Moun-

tains. PKL's shares in Tucker served as security for the LAPSC loan. The loan agreement between PKL and LAPSC was a nonrecourse, or in rem, loan, which meant that none of the general or limited partners were personally liable for nonpayment of the loan; LAPSC's sole remedy in the event PKL failed to repay the loan was to foreclose on the security. Under the plan, Tucker was to make periodic calls for additional capital to PKL, which in turn was to make calls to the individual limited partners.[6]

There were anticipated tax and business advantages to both LAPSC and PKL as a result of the tax plan. LAPSC would benefit from the 10 to 15 percent of the investors' donations it retained for itself, from the interest income on its loan to PKL and from the anticipated repayment of the loan. The individual investors would be able to deduct their contributions to LAPSC, and PKL would be able to deduct the interest expense on the loan payments and to pay the interest with pretax dollars. The purchase of shares in Tucker also offered tax advantages for PKL, including depreciation deductions and use of the capital gains structure on the subsequent sale of shares in Tucker.[7]

Unlike most of the individuals who participated in this transaction, petitioner did not invest any money in PKL. Instead, he received a 15 percent subordinate share in the assets of PKL—the Tucker land shares—as his fee for services rendered to LAPSC, which included (1) insuring that the money loaned by LAPSC was used to buy shares in Tucker and (2) drafting the necessary legal documents, including the loan agreement between PKL and LAPSC. Petitioner and LAPSC management both characterized his involvement with PKL as that of a "watchdog," ensuring that LAPSC's security—the shares in Tucker—was not impaired.

The plan did not run as smoothly as expected. PKL requested and received a loan extension from LAPSC because PKL did not realize a quick gain from the investment in Tucker. The recession in the early 1970's had a negative impact on the housing industry and environmental concerns forced Tucker to refrain from building on about 1,000 acres of land. In 1975, on the advice of general partner Cary Harwin, and without the prior knowledge or consent of petitioner, PKL decided not to meet the call from Tucker. As a consequence, the Tucker shares went into default and Tucker foreclosed on them, eliminating not only PKL's and its general partners'

---

[6]Tucker had a number of limited partners, among whom were the three limited partnerships in PKL. Under the Tucker limited partnership agreement, certain calls could be made to the limited partners to defray Tucker's obligations. If the calls were not covered, Tucker could sell the shares of the limited partner.

[7]The State Bar proceedings did not address the legality of this arrangement, or whether LAPSC's participation posed any threat to the organization's retention of its nonprofit status.

interest in the shares, but LAPSC's security interest as well; when PKL subsequently defaulted on its note to LAPSC, LAPSC was thus left without a remedy. Shortly after the foreclosure, several of the individual limited partners in PKL purchased the defaulted shares directly from Tucker, and evidence was presented at the hearing suggesting that Harwin had engineered the default to divert PKL assets and eliminate LAPSC's security interest.[8]

In 1977, limited partner Holly Dyer, represented by Barry Friedman, filed suit against Harwin, petitioner, the Pelwin and Kapwin companies (two of the three limited partnerships) and several limited partners for breach of fiduciary duty, and other causes of action. Friedman testified that petitioner was named because Dyer was also seeking dissolution of the Pelwin and Kapwin partnerships, and had to name all general partners, and not because petitioner had committed a breach of fiduciary duty.

Petitioner, for himself as general partner and as counsel for Pelwin and Kapwin, filed a cross-complaint in the Dyer action against Harwin, Dyer, Tucker, and numerous limited partners alleging that they had conspired to wrongfully divert partnership assets and to defraud Pelwin, Kapwin and LAPSC. The cross-complaint also named LAPSC as a cross-defendant, but did so solely for jurisdictional purposes, and expressly requested that LAPSC be realigned as a cross-complainant.

In February 1978, petitioner and Friedman negotiated a settlement of the Dyer action, and the complaint and cross-complaint were both dismissed with prejudice. In the course of the negotiations, Friedman sought assurances from petitioner that LAPSC would not bring a subsequent action against Dyer. Petitioner stated that he "doubted" there would be such a suit.

Three months later, however, in May 1978, petitioner did in fact file a complaint against Dyer and others on behalf of LAPSC, alleging the same facts and essentially the same claims contained in the previous cross-complaint. Petitioner testified that before filing this suit he had withdrawn as a general partner in PKL, although he had not filed the requisite certificate of withdrawal with the Los Angeles County Recorder's office. Thereafter,

---

[8] Petitioner testified that there was a preconceived scheme between general partner Harwin, Tucker, and several limited partners, including Dyer, not to respond to Tucker's calls, and to put money aside and have the limited partners buy the subsequently defaulted shares directly from Tucker, thus diverting PKL's assets from the partnerships and eliminating LAPSC's security interest and the general partners' interests. Barry Friedman, attorney for Dyer, testified that Cary Harwin advised Dyer and the other limited partners not to respond to Tucker's calls and to purchase the defaulted partnership units from Tucker directly.

Friedman moved to reinstate Dyer's earlier complaint and to recuse petitioner from representing LAPSC. The trial court granted those motions.

On the basis of the foregoing evidence, the review department found (1) that petitioner's interest in PKL was adverse to the interests of the limited partners and prevented him from impartially advising PKL or its limited partners; (2) that petitioner's interest was also adverse to LAPSC in that the note drafted by petitioner and issued to LAPSC by PKL was not adequately secured and exempted the individual partners, including petitioner, from personal liability; (3) that petitioner had willfully represented conflicting interests without consent in representing PKL in litigation against the individual limited partners, and (4) that petitioner had also willfully represented conflicting interests without the requisite consent in representing LAPSC in its action against PKL's limited partners. Petitioner challenges each of the four findings.

## A. Conflict of interest with limited partners or PKL

The review department initially found that petitioner, by obtaining a partnership share in PKL which, unlike other partnership shares, did not require either an initial or subsequent investment of capital, had acquired an interest "adverse to a client" within the meaning of former rule 4.[9] This finding was based on the conclusion that petitioner's interest was adverse to the interests of the limited partners, since it was in petitioner's interest for the limited partners to continue to respond to any requests for additional capital from Tucker, whereas it was not necessarily in the limited partners' interest to continue to make additional contributions which, by increasing or maintaining the value of the Tucker shares, would inure to the benefit of petitioner as well as to themselves. The State Bar concluded that this conflict prevented petitioner from impartially advising PKL or the individual partners.

We agree with petitioner that a finding of misconduct cannot be sustained on this theory. Although, as the State Bar suggests, petitioner's interest in PKL may well have been adverse to, or at least potentially in conflict with, the interests of the limited partners, the evidence does not support the State Bar's determination that an attorney-client relationship ever existed between petitioner and the individual limited partners. As petitioner points out, the evidence clearly shows that all of the individual investors retained independent counsel to advise them before becoming limited partners, and that they were well aware of petitioner's "watchdog" role on behalf of

---

[9] Former rule 4 provided: "A member of the State Bar shall not acquire an interest adverse to a client."

LAPSC. As petitioner suggests, there is no evidence that any of the limited partners ever sought his professional advice or attempted to establish an attorney-client relationship with him. Although, as a general partner of PKL, petitioner plainly owed a fiduciary duty to the limited partners in relation to the actions of the partnership, at least on the facts of this case we do not believe that the "general partner/limited partner" connection was sufficient to create an attorney-client relationship between petitioner and the individual investors. Thus, assuming petitioner acquired an interest adverse to the limited partners, because they were not his clients that acquisition did not violate former rule 4.

Although the evidence does indicate that petitioner had an attorney-client relationship with PKL itself—he drafted the partnership and loan agreements, prepared a loan extension and defended the partnership against the lawsuit filed by Dyer—there is nothing to indicate that petitioner's interest in PKL was contrary to the interest of PKL itself, as contrasted with the interests of the individual limited partners. As a general partner who stood to gain from PKL's success, petitioner's interest was parallel to PKL's, rather than adverse. Thus, petitioner did not violate former rule 4 by virtue of his interest in, and simultaneous representation of, PKL.

### B. *Conflict of interest with LAPSC*

The State Bar additionally found that petitioner violated former rule 4 by acquiring an interest adverse to LAPSC. Petitioner acknowledges, of course, that LAPSC was his client, but contends that his personal interest in PKL was not adverse to LAPSC's interest.

The State Bar found that petitioner's interest in PKL was adverse to LAPSC because the PKL assets had been obtained through a loan from LAPSC which was not adequately secured, and which specifically exempted the individual general partners of LAPSC, including petitioner, from personal liability. The State Bar found that as a result of the conflict between his own interests and those of LAPSC, petitioner had failed properly to advise LAPSC of the advisability of the nonrecourse provision or fully to explain that, in the absence of that provision, he would be personally responsible for the loan as a general partner of PKL.

Petitioner argues that the evidence demonstrates that he adequately informed LAPSC and received its consent to draft the notes as nonrecourse. He testified that he fully explained to Dr. Moran, the executive director of LAPSC, the necessity of making the notes nonrecourse because this was "vital" to the success of the tax advantage plan, and that it would be "suicide" for petitioner, as general partner, to have signed recourse paper.

Additionally, petitioner argues that he discussed with Moran the question of his fees, and that it was Moran who suggested that petitioner become the "watchdog" for LAPSC, and take an interest in the partnerships as his fee.

Even if LAPSC was aware of, and consented to, petitioner's acquisition of the partnership interest and the exemption of petitioner from personal liability on the notes, petitioner cannot avoid culpability for fashioning and participating in a financial transaction in which he held an interest that was adverse to his client. Since petitioner acquired his interest in PKL in 1969, his conduct must properly be assessed under the provisions of former rule 4, and past cases establish that that rule prohibited the acquisition of conflicting interests of this nature, whether or not the client consented. (*Ames* v. *State Bar* (1973) 8 Cal.3d 910, 915 [106 Cal.Rptr. 489, 506 P.2d 625]). In *Ames,* this court found that attorneys had violated former rule 4 when they purchased a senior encumbrance on realty owned by clients who held a junior encumbrance in order to protect the clients' interest against a threatened foreclosure of the senior encumbrance. Even though the clients consented, the clients were not harmed, and the action was taken to further the clients' interests, this court held that former rule 4 was absolute in its terms and forbade the acquisition by an attorney of any interest adverse to his client. We found that former rule 4 was designed not only to prevent fraudulent conduct but also to preclude the honest practitioner from placing himself in a position where he might be subsequently required to choose between conflicting interests to the ultimate detriment of his client. While recognizing that former rule 4 obviously did not "proscribe every business transaction engaged in by an attorney and his client" (8 Cal.3d at p. 917), *Ames* held that, under that rule, an attorney had a duty to avoid circumstances "where it is reasonably foreseeable that his acquisition may be detrimental, i.e., adverse, to the interests of his client." (*Id.* at p. 920.)

In the case at bar, petitioner's acquisition of an interest in PKL by which he would profit from PKL's success but not be personally responsible on its loan from LAPSC clearly put him in a position where his personal financial interest was in conflict with LAPSC's interest in obtaining full repayment of its loan. Although petitioner emphasizes that he acquired the partnership interest as his fee for assuming a "watchdog" role of PKL's actions on LAPSC's behalf, he does not explain why he could not have obtained his fee in an alternative form that did not create the conflict of interest that was posed by the mechanism he chose. And, while petitioner also asserts that the nonrecourse nature of the note was essential to the success of the tax advantage plan in order that all partners, general and limited, could share the depreciation benefits in the same proportion as they shared the profits, he fails adequately to explain why he had to participate as a general partner

and could not instead have obtained equivalent oversight privileges that did not pose a conflict of interest.

Finally, when petitioner obtained a loan extension on behalf of himself as general partner of PKL as well as the limited partners, his interest in PKL became patently adverse to his client LAPSC's interests: the extension benefitted petitioner at the expense of his client, LAPSC. Had petitioner not acquired his adverse interest in PKL, he might well have advised LAPSC that the inability of PKL to make its loan repayments foreshadowed decline in the value of the shares in Tucker, potential default on the loan and eventual foreclosure by Tucker, and that LAPSC would be better protected by foreclosing itself on the security—the shares in Tucker—while the shares still had some value rather than to grant an extension on the loan. Had LAPSC taken such action, it would have been able to recover at least some of its money it had loaned to PKL. Petitioner's conflict of interest precluded him from impartially advising LAPSC on the wisdom of granting the loan extension.

In sum, we conclude that the evidence supports the finding that petitioner violated former rule 4 by acquiring an interest adverse to LAPSC's interest.[10]

C. *Failure to obtain limited partners' consent before filing PKL's cross-complaint*

█ Petitioner also challenges the State Bar's finding that he willfully represented conflicting interests without the consent of all parties in representing PKL in its cross-complaint against the limited partners. Because it found that petitioner had represented both PKL and the limited partners, it concluded that his failure to obtain the consent of the individual limited partners before filing the cross-complaint against them violated rules 4-101 and 5-102.[11]

---

[10] The State Bar also found petitioner in violation of former rules 6 and 7 for failing to disclose to LAPSC his adverse interest in PKL, and for representing the conflicting interests of LAPSC and PKL without the informed consent of all concerned parties. In our view, the evidence does not support these findings, since uncontroverted testimony established that prior to the implementation of the original PKL/LAPSC arrangement, all parties were made aware of and consented to petitioner's adverse interest and to his dual role as counsel for PKL and LAPSC. Although the State Bar found that petitioner failed to disclose to LAPSC that, as a result of the in rem loan, its security was inadequate, a number of witnesses testified, without contradiction, that petitioner did disclose this adverse interest.

[11] Rule 4-101 provides: "A member of the State Bar shall not accept employment adverse to a client or former client, without the informed and written consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

As discussed above, however, we have concluded that the evidence does not support the State Bar's finding that petitioner had an attorney-client relationship with the individual limited partners. The State Bar alternatively argues that the charged violations can be sustained on the ground that petitioner, even if not the attorney of the limited partners, still owed them a fiduciary duty because of his position as general partner of PKL. Although in some contexts an attorney's fiduciary relationship with a nonclient may make it improper for the attorney to agree to represent a party who wishes to sue the nonclient (see, e.g., *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1047 [197 Cal.Rptr. 232]), in this case we believe that petitioner correctly maintains that there was no impropriety, either actual or apparent, in his defending the partnership against individual limited partners who were allegedly attempting to defraud or destroy it. (Accord *Meehan* v. *Hopps* (1956) 144 Cal.App.2d 284, 290 [301 P.2d 10].)

Further, the evidence fails to support the State Bar's finding that petitioner was privy to confidential information of the individual limited partners. As we have seen, those individuals were represented by separate counsel and there was no evidence that petitioner had obtained access to any confidential information of the limited partners. Accordingly, the finding that petitioner violated rules 4-101 and 5-102 by suing the limited partners without their consent cannot be sustained.

D. *Failure to obtain consent of the limited partners and LAPSC before bringing LAPSC's action against limited partners*

█ Finally, petitioner challenges the State Bar's finding that he violated rule 5-102 by bringing LAPSC's May 1978 action against the limited partners without revealing his conflict of interest and obtaining the written consent of all parties. Although, for the reasons just discussed, we agree with petitioner that he had no obligation to obtain the consent of the limited partners before bringing such an action, we think the finding should be sustained on the basis of his failure to make a full disclosure to, and obtain the written consent of, LAPSC.

Petitioner argues that because PKL, his other client, was not specifically named as a defendant in the May 1978 action by LAPSC, there was no conflict of interest for him to disclose to LAPSC. PKL was, however,

Rule 5-102 provides: "(A) A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment. A member of the State Bar who accepts employment under the rule shall first obtain the client's written consent to such employment. (B) A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."

obviously a potential defendant in such action, and, in addition, petitioner, as a general partner in PKL, was himself potentially liable to LAPSC for his failure to take steps to prevent the limited partners from defaulting on their calls to Tucker. By failing to name either PKL or himself as defendants, petitioner shielded both himself and one client from liability at the expense of another client, LAPSC. Under rule 5-102, petitioner was obligated to disclose this conflict and obtain LAPSC's written consent. And while petitioner testified that he did receive LAPSC's oral consent to pursue the action which he brought, Larry Moran, the son of Dr. Moran, testified that LAPSC's consent was given only after petitioner's repeated assurances that there was no conflict of interest. Furthermore, petitioner's culpability in this regard is aggravated by the fact that he resolutely refused to recuse himself from the LAPSC action even after recusal was requested by the trial court in that action.

Accordingly, we conclude that the evidence supports the finding that petitioner violated rule 5-102 by his conduct in relation to the May 1978 LAPSC action.

## IV.  *Discipline*

There is, of course, a marked disparity between the hearing panel's recommendation that petitioner be suspended for two years with sixty days actual suspension and the review department's recommendation of disbarment.  ■  While we exercise our independent judgment in determining the appropriate punishment (*Gordon* v. *State Bar* (1982) 31 Cal.3d 748, 757 [183 Cal.Rptr. 861, 647 P.2d 137]), the review department's recommendation is entitled to great weight. (*Smith* v. *State Bar* (1985) 38 Cal.3d 525, 539 [213 Cal.Rptr. 236, 698 P.2d 139].)

The review department cited a number of factors that it considered in increasing petitioner's discipline to disbarment. Petitioner's two prior disciplinary actions are important considerations, especially given their severity. In 1970 petitioner was suspended for three years and five months for his involvement and federal conviction in a mail fraud scheme.[12] In 1979 he was publicly reproved for receiving a fee for referring a client to a loan company without notifying the client that he was receiving a referral fee.[13]

---

[12] In 1969, petitioner was convicted of violating 18 United States Code section 1341 (use of the mails in a scheme to defraud) and 18 United States Code section 2 (aiding and abetting), was sentenced to one year in prison (subsequently modified to one hundred days) and was placed on probation for five years. On July 22, 1970, this court suspended petitioner from the practice of law pending appeal of his conviction; thereafter, in 1973, petitioner was retroactively suspended, from July 22, 1970, for three years and five months, due to this conviction.

[13] At oral argument, the question was raised whether this court could properly consider past conduct of the petitioner that had been referred to in unrelated appellate decisions but

The review department also indicated that it considered petitioner's "active participation in a tax avoidance scheme in pursuing aggressively the litigation in which he had a conflict of interest . . . ." It is difficult to tell from this language whether the review department considered petitioner's involvement in a "tax avoidance" plan as, in itself, reason for increasing the punishment. Since the illegality of the tax plan was not alleged by the State Bar, we will not consider his obtaining of tax benefits as an independent basis of discipline. The record does, however, fully support the finding that petitioner "aggressively" pursued litigation in which he had a conflict of interest, repeatedly refusing to recuse himself despite the trial court's request that he withdraw.

The review department also cited petitioner's "fraudulent conduct in effecting the Dyer settlement" as a reason to increase the recommended discipline. This characterization of petitioner's conduct may overstate the evidence presented in this case. Both petitioner and Friedman, the negotiating attorney for the adverse party, testified that petitioner simply stated that he "doubted" that LAPSC would file a claim against the individual limited partners of PKL. Although Friedman testified that he felt that petitioner was assuring him that no such suit would be filed, absent more substantial evidence of petitioner's fraudulent intent, we are hesitant to rely on this incident as a basis for increased discipline.

Finally, the review department pointed to petitioner's lack of remorse toward the victims of his misconduct as a basis for increased discipline. Although, as petitioner points out, in some circumstances lack of remorse is not fairly indicative of increased culpability (see, e.g., *Calaway* v. *State Bar* (1986) 41 Cal.3d 743, 747-748 [225 Cal.Rptr. 267, 716 P.2d 371]), in this case we believe the record supports the review department's reliance on petitioner's attitude as an aggravating factor, since he refused to accept responsibility even for those aspects of his misconduct—his refusal to communicate with Hammer and his failure to bring his obvious conflict of interest in connection with the LAPSC suit to LAPSC's attention—which are manifestly indefensible.

■ In determining the appropriate discipline, we take note, of course, of the fact that we have found that a number of the State Bar's findings—particularly those resting on its conclusion that an attorney-client relationship existed between petitioner and the limited partners—are not supported

had not been considered by the State Bar Court in this proceeding. The parties have filed briefs on that issue, but we conclude that there is no need to resolve that question in this case because we find that the State Bar's recommendation of disbarment is warranted on the basis of the matters on which the State Bar itself relied. We emphasize that our decision rests solely on the matters considered by the State Bar Court.

by the evidence. (See, e.g., *McCray* v. *State Bar* (1985) 38 Cal.3d 257, at p. 273 [211 Cal.Rptr. 691, 696 P.2d 83].) Nonetheless, we are mindful that the primary purposes in assessing discipline are to protect the public, to promote confidence in the legal system and to maintain high professional standards. (See, e.g., *Smith* v. *State Bar, supra,* 38 Cal.3d at p. 539.) The ethical violations which were adequately established here were not petitioner's first instances of misconduct; in the past, this court has been required to discipline him on two separate occasions for other serious misconduct. ▉▉ ▉▉▉ ▉▉▉ (See Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct (eff. Jan. 1, 1986) std. 1.7(b).)[14] ▉▉ In addition, petitioner's stubborn refusal to acknowledge the impropriety of his actions makes it difficult to feel confident that he will conform his conduct to the required high professional standards in the future. The risk of petitioner engaging in other misconduct if permitted to continue in practice is considerable, and we believe that the public and the legal profession would not be sufficiently protected by a mere suspension. (*Rimel* v. *State Bar* (1983) 34 Cal.3d 128, 131-132 [192 Cal.Rptr. 866, 665 P.2d 956]; *Ambrose* v. *State Bar* (1982) 31 Cal.3d 184, 196 [181 Cal.Rptr. 903, 643 P.2d 486].)

Accordingly, it is ordered that petitioner Marvin B. Kapelus be disbarred from the practice of law and that his name be stricken from the roll of attorneys. It is further ordered that petitioner comply with the requirements of rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective upon finality of the decision.

**MOSK, J.**—I dissent.

On the unethical conduct scale of one to ten, the behavior of this petitioner rates no more than a five. When his prior discipline is considered, the

---

[14]Standard 1.7(b) provides: "If a member is found culpable of professional misconduct in any proceeding in which discipline may be imposed and the member has a record of two prior impositions of discipline as defined by Standard 1.2(f), the degree of discipline in the current proceeding shall be disbarment unless the most compelling mitigating circumstances clearly predominate."

The hearing panel decision in this case was filed prior to the effective date of the new State Bar standards for attorney sanctions. Nevertheless, in *Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550-551 [237 Cal.Rptr. 168, 736 P.2d 754], we recently noted that the new guidelines, while not binding on this court, may properly be considered in assessing the appropriate sanction for conduct predating the standards. The new standards serve as guideposts for this court to ensure that the purposes of attorney discipline—protection of the public, promotion of confidence in the legal system, and the maintenance of high professional standards—are met in a particular case and to achieve greater consistency in the imposition of sanctions. (See, e.g., *Guzzetta* v. *State Bar, supra,* 43 Cal.3d 962, 967-968; *Kent* v. *State Bar* (1987) 43 Cal.3d 729, 737 [239 Cal.Rptr. 77, 739 P.2d 1244.)

number may rise a point or two. The result, however, is short of that which merits disbarment.

The State Bar hearing panel, after taking evidence and observing the witnesses, recommended discipline of two years suspension with conditions of probation that included sixty days of actual suspension. That might be unduly lenient: I would be agreeable to a longer period of actual suspension. But I believe disbarment to be a Draconian result for the relatively marginal conduct involved in this proceeding.

Broussard, J., and Panelli, J., concurred.

**KLINE (J. Anthony), J.\*** ▇▇▇▇ ▇▇ ▇▇▇ I concur in the judgment ordering disbarment but dissent with respect to the standard of review.

My conclusion that petitioner should be disbarred rests primarily upon the fact that he has suffered two prior impositions of discipline. Standards recently promulgated by the State Bar prescribe disbarment in such circumstances, unless "the most compelling mitigating circumstances clearly predominate." (Rules Proc. of State Bar, div. V, Standards for Atty. Sanctions for Prof. Misconduct (eff. Jan. 1, 1986) std. 1.7(b).)[1] This court has deemed that sanction applicable even where, as here, the decision of the hearing panel predated the new standards. (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550-551 [237 Cal.Rptr. 168, 736 P.2d 754]; see also *Guzzetta* v. *State Bar* (1987) 43 Cal.3d 962, 967-968 [239 Cal.Rptr. 675, 741 P.2d 172].)

For me, the dispositive question is whether there are sufficient mitigating circumstances presented in connection with the present misconduct to warrant an exception to the severe penalty that should otherwise apply. In answering this question in the negative I accord greater weight than does the majority to the factual findings of the State Bar hearing panel; that is, I do not find it necessary to "resolve all reasonable doubts in favor of the attorney." (Maj. opn., p. 183.) As a result, I do not find this case as close as the majority makes it appear.

In my view, the standard of judicial review traditionally applied in bar disciplinary cases is untenable as a matter of law and obsolete as a matter of

---

\*Presiding Justice, Court of Appeal, First Appellate District, Division Two, assigned by the Chairperson of the Judicial Council.

[1]Standard 1.7(b) provides that "If a member is found culpable of professional misconduct in any proceeding in which discipline may be imposed and the member has a record of two prior impositions of discipline as defined in Standard 1.2(f), the degree of discipline in the current proceeding shall be disbarment unless the most compelling mitigating circumstances clearly predominate."

social policy. I write separately to explain why and to identify what I believe is the more appropriate standard.

1.

The standard of review ordinarily employed to evaluate State Bar findings comes dangerously close to a contradiction. On the one hand, because the hearing panel has a "greater opportunity to observe and judge the credibility of the witnesses" (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 578 [119 Cal.Rptr. 335, 531 P.2d 1119]), the court regularly reiterates, as it does in this case, that it accords great weight to the panel's findings. (*Bach* v. *State Bar* (1987) 43 Cal.3d 848, 855 [239 Cal.Rptr. 302, 740 P.2d 414]; *Franklin* v. *State Bar* (1986) 41 Cal.3d 700, 708 [224 Cal.Rptr. 738, 715 P.2d 699]; *Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 12 [206 Cal.Rptr. 373, 686 P.2d 1177]; *Warner* v. *State Bar* (1983) 34 Cal.3d 36, 43 [192 Cal.Rptr. 244, 664 P.2d 148]; *Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 916 [180 Cal.Rptr. 831, 640 P.2d 1106].) The court just as frequently points out, however, as it also does in this case, that "we must resolve all reasonable doubts in favor of the attorney." (*Galardi* v. *State Bar* (1987) 43 Cal.3d 683, 689 [238 Cal.Rptr. 774, 739 P.2d 134]; *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82]; *Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 852 [100 Cal.Rptr. 713, 494 P.2d 1257].)

It is, of course, difficult to think that a finding relied upon to support a disbarment recommendation is genuinely accorded "great weight" if "all intendments should be in favor of innocence, and that where two or more equally reasonable inferences may be drawn from a fact shown, that inference leading to a conclusion of innocence should be accepted rather than one leading to a conclusion of guilt."[2] (*In re Bar Association of San Francisco* (1921) 185 Cal. 621, 624 [198 P. 7].) Because the standard of review does not make sense, it invites rather than inhibits de novo judicial consideration of the evidence.[3]

---

[2] Ordinarily, under what has been referred to as "the rule of conflicting inferences" (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 288, p. 300), the inference that should be favored is that which supports the judgment. (See, e.g., *Hamilton* v. *Pacific Elec. Ry. Co.* (1939) 12 Cal.2d 598, 602-603 [86 P.2d 829] ["The fact that some inference other than that which has been drawn by a jury may appear to an appellate tribunal to be the more reasonable, affords no sufficient reason for disturbing the inference in question"]; *Mah See* v. *North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123]; *McIntyre* v. *Doe & Roe* (1954) 125 Cal.App.2d 285, 287 [270 P.2d 21].)

[3] In this connection, the findings of the hearing panel as to the facts must be distinguished from the recommendation of the review department regarding the degree of discipline. The "great weight" accorded the recommendation, unlike that accorded the findings, is not diminished by the need to resolve any doubts in favor of the accused attorney. The significance of this distinction is dubious, however, because judicial deference to the recommended disci-

2.

The principle that in a disbarment proceeding this court should resolve such doubts as the evidence may reasonably permit in favor of the accused attorney has been applied on the theory "that a disbarment proceeding is *quasi*-criminal in character." (*Furman* v. *State Bar* (1938) 12 Cal.2d 212, 229 [83 P.2d 12]; *In re McCowan* (1917) 177 Cal. 93, 105 [170 P. 1101]; see also *Frazer* v. *State Bar* (1987) 43 Cal.3d 564, 567 [238 Cal.Rptr. 54, 737 P.2d 1338].) This idea traces back to the early opinion in *Matter of Haymond* (1898) 121 Cal. 385 [53 P. 899], in which the court's decision not to disbar rested on the assumption, unsupported by statutory or decisional authority, that an accusation against an attorney "is in the nature of a criminal charge, and all intendments are in favor of the accused." (*Id.,* at p. 388; see also *In re Luce, McDonald, & Torrance* (1890) 83 Cal. 303, 306 [23 P. 350] [because disbarment proceeding "is *quasi* criminal in its nature," accused attorneys "are entitled to the benefit . . . of the presumption . . . of good character"].) The principle thereby created appears to have developed out of the fact that disbarment deprives the attorney of important "personal and property rights."[4] (*Disbarment of Houghton* (1885) 67 Cal. 511, 517 [8 P. 52]; *In re Stephens* (1890) 84 Cal. 77, 81 [24 P. 46]; *In re Bar Association of San Francisco, supra,* 185 Cal. 621, 623.)

It is important to understand that during the 19th century, when the principle in question was conceived, the State Bar did not exist and the Supreme Court did not review the determination or recommendation of another body reached after the elaborate sort of administrative hearings with which we are now familiar. Instead, the court was obliged to react *ab initio* to an "accusation" that could be filed by anyone, including a disgruntled former client (see, e.g., *In re Burris* (1894) 101 Cal. 624 [36 P. 101]), a legal adversary (see, e.g., *In re Tyler* (1886) 71 Cal. 353 [12 P. 89]), or even an angry court. (*In re Philbrook* (1895) 105 Cal. 471 [38 P. 511, 38 P. 884].) The evidence in support of the "charges" was presented either to a referee designated by the court (*In re Cobb* (1890) 84 Cal. 550 [24 P. 293]; *In re Lowenthal* (1884) 2 Cal. Unrep. 300 [3 P. 657]) or at a "trial" conducted by the court itself. (*In re Cowdery* (1886) 69 Cal. 32, 34 [10 P. 47]; see also, *In re Stephens* (1888) 77 Cal. 357 [19 P. 646], overruling demurrer and requiring attorney to file answer.)

pline usually depends on the weight, if any, actually accorded the State Bar's factual determinations.

[4] Although the principle was originally applied only in the context of disbarment, it gradually came to be employed in cases in which the proposed discipline was much less severe. (See, e.g., *Vaughn* v. *State Bar, supra,* 6 Cal.3d 847 [public reproval recommended]; *Ashe* v. *State Bar* (1969) 71 Cal.2d 123 [77 Cal.Rptr. 233, 453 P.2d 737] [six months suspension recommended]; *Hildebrand* v. *State Bar* (1941) 18 Cal.2d 816 [117 P.2d 860] [six months suspension recommended].)

In light of this rudimentary disciplinary process, in which the Supreme Court essentially functioned as a trial court, it is easy to understand why it was originally thought appropriate to resolve evidentiary doubts in favor of the accused attorney. But it is not easy to understand why this principle survives today, a half century after creation of the State Bar, considering the extraordinary protections attorneys receive during the administrative phases of the contemporary disciplinary process,[5] and considering the wholly different role of this court in that process.

The confusion that results from the continuing vitality of the principle that "[a]ll reasonable doubts are to be resolved in favor of the attorney" (*Frazer* v. *State Bar, supra,* 43 Cal.3d 564, 569), which is often mistakenly thought to refer to the State Bar's burden of proof,[6] has long been evident. (See, e.g., *Rosenthal* v. *State Bar, supra,* 43 Cal.3d 612, 634; *In re Vaughn* (1922) 189 Cal. 491, 495-496 [209 P. 353, 24 A.L.R. 858]; *Fish* v. *The State Bar* (1931) 214 Cal. 215, 222 [4 P.2d 937].) Nonetheless, the so-called "intendment" of innocence fashioned nearly a century ago and never reexamined continues to resound within the case law. (See, e.g., *Galardi* v. *State Bar, supra,* 43 Cal.3d 683, 689; *Chefsky* v. *State Bar, supra,* 36 Cal.3d 116, 121; *Vaughn* v. *State Bar, supra,* 6 Cal.3d 847, 852.)

The notion that bar disciplinary proceedings are "criminal" or "*quasi-*criminal" in character is impossible to reconcile with the modern view, repeatedly endorsed by this court, that the objective of such proceedings "is not to impose punishment upon members of the profession" but "to ensure that the public, the courts, and the profession are protected against unsuitable legal practitioners. [Citations.]" (*In re Higbie* (1972) 6 Cal.3d 562, 570 [99 Cal.Rptr. 865, 493 P.2d 97].) As the court often notes, "[p]roceedings before the State Bar are *sui generis,* neither civil nor criminal in character, and *the ordinary criminal procedural safeguards do not apply.* [Citations.]" (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 447 [113 Cal.Rptr. 602, 521 P.2d 858], italics added; see also Comment (1921) 9 Cal.L.Rev. 484; *McComb* v. *Commission on Judicial Performance* (1977) 19 Cal.3d Spec. Trib. Supp. 1, 9 [138 Cal.Rptr. 459, 564 P.2d 1].)

[5]The most recent description of this elaborate process is set forth in Fellmeth, Initial Report to the Assembly and Senate Judiciary Committees and Chief Justice of the Supreme Court: A Report on the Performance of the Disciplinary System of the California State Bar (June 1, 1987) pages. 7-20 (hereinafter the Fellmeth Report).

[6]This court periodically finds it necessary to remind attorneys petitioning for relief that, because the purpose of State Bar disciplinary proceedings is not to punish, such proceedings "are not governed by a reasonable doubt standard of proof as in criminal trials." (*Arden* v. *State Bar* (1987) 43 Cal.3d 713, 725 [239 Cal.Rptr. 68, 739 P.2d 1236]; *Rosenthal* v. *State Bar* (1987) 43 Cal.3d 612, 634 [238 Cal.Rptr. 377, 738 P.2d 723]; *Ring* v. *The State Bar* (1933) 218 Cal. 747, 750 [24 P.2d 821].) Of course, as I shall suggest, the same rationale compels rejection of the principle that conflicting inferences that may be drawn from the evidence should be resolved by this court in favor of innocence and against the State Bar.

The analogy to criminal proceedings and the resolution of reasonable doubts in favor of the attorney in the course of judicial review is also inconsistent with Business and Professions Code section 6083, subdivision (c), originally enacted in 1927 as part of the State Bar Act (Stats. 1927, ch. 34, § 26, p. 41), which provides that upon review of any decision of the State Bar recommending disbarment or suspension from practice "the burden is upon the petitioner to show wherein the decision or action is erroneous or unlawful." This statutory presumption is rendered meaningless, and the standard of review essentially left undefined, by perpetuation of the enigmatic proposition that, notwithstanding the burden the statute places on the petitioning attorney, in weighing the evidence "[a]ll reasonable doubts will be resolved in favor of the accused . . . ." (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993].)

Furthermore, because the resolution of reasonable doubts in favor of the attorney subjects State Bar findings and disciplinary recommendations to a higher level of scrutiny than that specified by the Legislature, the practice cannot be squared with statements of this court that disbarment proceedings are " ' "governed exclusively by the Code sections specifically covering them." ' " (*Fish* v. *The State Bar, supra,* 214 Cal. 215, 222; *In re Vaughn, supra,* 189 Cal. 491, 496; *Matter of Danford* (1910) 157 Cal. 425, 430 [108 P. 322].) Although this court has on a few occasions applied the statutory presumption undiminished by the judicially created "intendment" of innocence (see, e.g., *Aydelotte* v. *State Bar of California* (1930) 209 Cal. 737, 740 [290 P. 41]), it ordinarily refuses to be constrained by the scope of review prescribed by the Legislature.

3.

The unusual power of self-regulation conferred upon the legal profession[7] does not appear to have been exercised in a notably vigorous manner. Indeed, disbarment is proposed and occurs more rarely than many informed observers believe warranted.[8] Thus attorneys do not as a practical matter require the added judicial protection they receive.

---

[7] Lawyers are the only state licensees whose professional association is given constitutional status (Cal. Const., art. VI, § 9) and empowered not only to formulate the rules of professional conduct (Bus. & Prof. Code, §§ 6076, 6076.5) but also to control the administrative process by which those rules are enforced. (Bus. & Prof. Code, §§ 6077, 6078.)

[8] "Except in the most egregious cases, the bar has always been disinclined to cast out a colleague for abuses within a lawyer-client relationship. Every major analysis of the disciplinary structures has found them grossly insensitive both to serious professional misconduct and to garden variety problems of delay, neglect, incompetence and overcharging. Surveys of bar procedures in major states reveal that some 90% of complaints are dismissed without investigation, and national statistics reflect that of grievances falling within disciplinary jurisdiction, less than 3% result in public sanctions and only .8% in disbarment. Even repeated instances

Nor can such special treatment be justified by the important function lawyers perform in our society. On the contrary, as this court once pointed out, "[t]he adequate protection of public interests, as well as inherent and inseparable peculiarities pertaining to the practice of law, require *a more detailed supervision by the state over the conduct of this profession than in the case of almost any other profession or business.*" (*In re Galusha* (1921) 184 Cal. 697, 698 [195 P. 406], italics added.) Subjecting findings of the State Bar adverse to an attorney to a higher level of judicial scrutiny than applies to corresponding findings of other licensing bodies makes it harder than it should be for the State Bar to discharge the responsibility imposed upon it by the Legislature and by this court.

Acknowledging that the disciplinary system has been unduly indulgent and that punishment has been imposed erratically, the State Bar has recently endeavored to fashion penalties that are "stern, fair, fit the offense, and are uniform where they ought to be." (Heilbron, *Solving the Discipline Problem* (1986) 6 Cal. Law. 53.) In promulgating the Standards for Attorney Sanctions for Professional Misconduct adopted in 1985, which were designed "to achieve greater consistency in disciplinary sanction for similar offenses" (Rules Proc. of State Bar, div. V, *supra*, Introd.), the Board of Governors of the State Bar expressed its concern that uniform disciplinary standards are not ascertainable from the decisions of this court "and that a wide variety of disciplinary sanctions have been imposed for a given offense." (*Ibid.*) Witkin supports this view, pointing out that "[t]he decisions reveal little pattern in the discipline imposed for serious acts of moral turpitude." (1 Witkin, Cal. Procedure, Attorneys, § 515, p. 557.) Although many judicial decisions "apply the general rule that, in the absence of mitigating circumstances, the appropriate penalty for serious offenses is disbarment" (*Id.,* § 516, pp. 557-558), "a greater number . . . imposed no greater penalty than suspension for acts involving moral turpitude." (*Id.,* § 517, p. 559.)

The inconsistency in the case law is at least in part the result of the confusing standard of review that has been applied. Given the inherent

of neglect, misrepresentation, and incompetence will rarely provoke license revocation." (Rhode, *Moral Character as a Professional Credential* (1985) 94 Yale L.J. 491, 547-548, fns. omitted; see also, Report of A.B.A. Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement (1970); Martyn, *Lawyer Competence and Lawyer Discipline: Beyond the Bar?* (1981) 69 Geo. L.J. 705; Steele & Nimmer, *Lawyers, Clients and Professional Regulation,* 1976 Am. B. Found. Res. J. 919.) Available statistics indicate that bar discipline has been imposed no more strictly in California than it has been elsewhere. (See, e.g., Fellmeth Report, *supra,* at pp. 143, 144; ["Adjudicated disbarments were 22 in 1986. There were 20 in 1981. [There are states where the per capita disbarment rate is ten times these levels.]"]; Egelko, *State Bar Discipline Under Fire* (1986) 6 Cal.Law., 55, 59.)

subjectivity of the ethical concepts involved in most disciplinary determinations (see *Konigsberg* v. *State Bar* (1957) 353 U.S. 252, 263 [1 L.Ed.2d 810, 819, 77 S.Ct. 722]), some inconsistency is inevitable and perhaps just. But the failure to coherently define the scope of review—which permits the court to give short shrift to State Bar findings and to undertake unfettered de novo consideration "on a case-by-case basis" (*Schneider* v. *State Bar* (1987) 43 Cal.3d 784, 798 [239 Cal.Rptr. 111, 739 P.2d 1279])—has led to discrepancies that are unreasonable, unnecessary and unjust. Such wholly discretionary adjudication calls to mind the image, conjured by Roscoe Pound, of the "oriental cadi administering justice at the city gate by the light of nature tempered by the state of his digestion for the time being." (Pound, *The Decadence of Equity* (1905) 5 Colum.L.Rev. 20, 21.) This approach may have its virtues, but principled and predictable decision-making is not among them.

4.

If a disbarment proceeding can be deemed "*quasi*-criminal" because an adverse decision operates to deprive the accused attorney of important vested rights (*In re Bar Association of San Francisco, supra,* 185 Cal. 621, 623), then the same characterization should apply to any administrative proceeding that could result in revocation of a license legally required in order to ply a trade or profession. Yet among the scores of professionals and tradespersons licensed by this state, only attorneys enjoy the benefit of a judicially developed "intendment" in favor of innocence when called upon to defend conduct found by the licensing body to have been unethical. There is no satisfactory rationale for this distinction.

For purposes of judicial review, a disbarment recommendation of the State Bar seems to me materially indistinguishable from any administrative decision revoking a professional license.[9] Because such decisions substantially affect vested, fundamental rights, California trial courts not only examine the administrative record for errors of law but, like this court in State Bar

---

[9] Because members of the bar are officers of the court, and due to the constitutional separation of powers, the courts have an inherent regulatory power over the legal profession that they do not possess over other professions. (*Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 443 [281 P. 1018, 66 A.L.R. 1507].) Nonetheless, "the power of the legislature to impose reasonable restrictions upon the practice of the law has been recognized in this state almost from the inception of statehood." (*Ibid.*) As stated in *Ex Parte Yale* (1864) 24 Cal. 241, 244: "The manner, terms, and conditions of their admission to practice, and of their continuing in practice, as well as their powers, duties and privileges, are proper subjects of legislative control to the same extent and subject to the same limitations as in the case of any other profession or business that is created or regulated by statute." See also *In re Galusha, supra,* 184 Cal. 697, 698, where the court suggests that the legal profession warrants closer legislative supervision than others.

disciplinary matters, exercise their independent judgment upon the evidence. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242].) As stated in *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75 [87 P.2d 848], "the court to which the application for mandate is made to secure the restoration of a professional license must exercise an independent judgment on the facts. . . . [I]n weighing the evidence the courts can and should be assisted by the findings of the board. The findings of the board come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence."[10] (*Id.*, at p. 85.) This presumption of correctness, which is the functional equivalent of that statutorily accorded State Bar disciplinary recommendations (Bus. & Prof. Code, § 6083, subd. (c)), and which is inconsistent with judicial preference for inferences that lead to innocence over those that lead to guilt, should be applied in cases such as the one before us. As I have earlier suggested, there is no reason the evidence relied upon to justify disbarment should be viewed with a more jaundiced judicial eye than that relied upon to justify revocation of the license of any other licensed professional.[11] If protection of the public, the courts and the legal profession is genuinely the chief consideration, then the benefit of such doubt as a reviewing court may entertain should be given to the finding of misconduct, not the attorney who is its subject.

---

[10] "A decision which is contrary to the weight of the evidence is one which is contrary to the preponderance of the evidence. The purpose for which a court normally weighs the evidence is to determine which way it preponderates on a given issue. Evidence Code section 115 provides in pertinent part: 'Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence.' Thus, an unexplained statement that a reviewing court shall weigh the evidence is a statement that it shall determine whether the evidence preponderates in favor of, or against, the administrative decision under review." (*Chamberlain* v. *Ventura County Civil Service Com.* (1977) 69 Cal.App.3d 362, 368-369 [138 Cal.Rptr. 155]; see also *People* v. *Miller* (1916) 171 Cal. 649, 652 [154 P. 468] [" 'preponderance of the evidence' . . . means what it says, viz., that the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily in number of witnesses or quantity, but in its effect on those to whom it is addressed"].)

Whether an administrative decision is supported by or is contrary to the weight of the evidence can be, and indeed ordinarily is, decided by a reviewing court without resolving against the administrative agency conflicting inferences that could both reasonably be drawn from the evidence.

[11] It is true that attorneys can obtain review of an adverse decision from only one court, whereas other licensees can obtain it at multiple levels. On the other hand, attorneys probably have greater protections during the administrative process and, in any event, are the only licensees possessing a right to Supreme Court review. Moreover, if the right to review by only one court were thought a sufficient reason to give attorneys the benefit of an evidentiary doubt enjoyed by no other licensees, the better alternative would be to permit lower court review of bar discipline. See Fellmeth Report, *supra*, at pages 138-139; see also Comment, *Attorney Discipline and the California Supreme Court: Transfer of Direct Review to the Courts of Appeal* (1984), 72 Cal.L.Rev. 252.

With respect to the instant case, it seems to me entirely reasonable and proper to disbar an unrepentant attorney, twice previously disciplined (once for conviction of a criminal offense involving an element of fraud), who conmits new acts of misconduct unabated by compelling mitigating circumstances, as called for by the new State Bar standards. As the bar leaders who promulgated those standards were doubtless aware, "[e]xpressions of derision and distrust of lawyers are too prevalent to be disregarded by the members of the legal profession, and it is only through the action of the organized bar that the high standards lawyers are entitled to can be maintained." (*In re Goldstein* (1952) 411 Ill. 360, 367 [104 N.E.2d 227, 230].) This court should not interfere in the effort to maintain such high standards absent stronger reason than is presented by this case.

Petitioner's application for a rehearing was denied January 28, 1988, and the opinion was modified to read as printed above. Kaufman, J., did not participate therein.